**EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,**
Plaintiff–Appellee,

v.

**PREVO'S FAMILY MARKET, INC.,**
Defendant–Appellant.

**No. 97–1001.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 8, 1997.

Decided Feb. 4, 1998.

---

Craig H. Lubben (argued and briefed), Elizabeth M. McIntyre (briefed), Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for Defendant–Appellant.

Paul D. Ramshaw (argued and briefed), Equal Employment Opportunity Commission, Washington, DC, for Plaintiff–Appellee.

Before: SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. MOORE, J. (pp. 1098–1104), delivered a separate dissenting opinion.

## OPINION

CLAY, Circuit Judge.

In this case involving the Americans with Disabilities Act (ADA), defendant, Prevo's Family Market, Inc., (Prevo's) appeals the district court's order on motion by plaintiff, Equal Employment Opportunity Commission (EEOC), for summary judgment on the issue of liability and award of compensatory damages, back pay, pre-judgment interest, punitive damages and reinstatement of one of its employees, Steven Sharp (Sharp), who has claimed to be HIV positive. The district court held Prevo's unlawfully dismissed Sharp after his refusal to submit to a medical examination and allowed trial on the issues of compensatory and punitive damages. Prevo's post-trial motion for a judgment as a matter of law, which was denied, argued that there was insufficient evidence to support an award of punitive damages by the jury.

For the reasons stated herein, we REVERSE the district court's grant of summary judgment in favor of the EEOC on the issue of liability and instead enter judgment in favor of Prevo's, holding *that* Prevo's did not violate the Americans with *Disabilities*

Act in its treatment of Steven Sharp. Accordingly, we VACATE the award of compensatory damages, back pay, pre-judgment interest and reinstatement. Having found no liability on the part of Prevo's, we do not reach the issue of whether its actions warrant an award of punitive damages; therefore, we VACATE the district court's award of punitive damages.

## I. Factual Background

Prevo's Family Market, Inc., is a family owned grocery store chain in western Michigan. Prevo's began in the 1940's and now operates seven stores in that portion of the state. Steven Sharp worked for Prevo's at its store in Traverse City, Michigan, in August of 1992 as a part time produce clerk. He had been transferred to this position from a position within Prevo's as a full-time employee.[1] On January 13, 1993, after working at Prevo's for several months, Sharp told his employers that he had tested positive for the human immunodeficiency virus (HIV), which is known to cause acquired immunodeficiency syndrome (AIDS).[2] Sharp also told his employers he was planning to participate in an AIDS awareness and education program and would be speaking at Traverse City High School. He told his employers he would not be mentioning where he worked inasmuch as he did not believe it to be related to his affliction. A number of Prevo's employees have children who attend Traverse City High School, and Sharp thought that news of his speaking about HIV and AIDS to his employer should come from him rather than someone else. In a conversation with Dan Prevo, the president of the grocery chain, Sharp and Prevo's discussed the possibility of Sharp working in another part of the store. Since Sharp was interested in an opening in the cash room, he did not initially object. Prevo's proceeded to reassign Sharp to a part-time position in the receiving area, with comparable hours and pay.

After two days in the receiving position, upon inquiry by Dan Prevo about how he was doing, Sharp explained that he wasn't interacting with customers, which was something he enjoyed in the produce area, and that other employees were commenting about disrupted work schedules and asking a lot of questions about why he had been reassigned. Prevo and Sharp next agreed that Sharp would be placed on a leave of absence with pay and health benefits to get Sharp out of the situation of being asked questions and to give Prevo's a chance to get the information that they needed to properly handle the situation. It was not at all clear why Sharp experienced discomfort at being asked about the reason for the change in his work assignment since Sharp had indicated his desire to perform public speaking in connection with an AIDS awareness and education program.

Sharp promised his employer that he would obtain verification of his HIV condition from his personal physician and furnish the information to his employer. While on paid leave, Prevo's provided health benefits to Sharp although Sharp was not entitled to them as a part-time employee.

By March of 1993, Sharp had not provided the medical information; rather, he consulted attorneys as to whether he should provide such information. In May of 1993, Prevo's, Sharp and their attorneys attempted to reach an agreement on Sharp's continued employment. Dan Prevo again requested that Sharp provide the store with his medical information so that he could make a decision about Sharp's employment situation. He also expressed concern about Sharp's use of knives and the typical cuts and nicks suffered by produce clerks in preparing produce for show. Both parties agree that produce clerks often cut themselves in the course of

---

1. Sharp had applied for a full-time position in the produce department, but the position was given to someone else. Sharp does not argue it was the result of discriminatory action. Sharp asked if a part-time position was available in the produce department. He was told there was and was warned that in moving from full-time to part-time he would not be eligible to receive company paid medical benefits. Nonetheless, Sharp chose to take the part-time produce position.

2. Sharp admits that he had worked from May 2, 1992 until August 31, 1992 as a produce clerk knowing he had tested positive for HIV, but did not disclose this to Prevo's or his co-workers.

their regular duties.[3] Additionally, Prevo's raised concerns that Sharp would be susceptible to other infectious diseases, including hepatitis and tuberculosis.[4] Sharp's attorney advised him to provide the requested medical information. Sharp continued to promise medical information about his condition from his personal physician, but the information was never forthcoming. Finally, in November of 1993, Prevo's asked that Sharp consent to a medical examination. According to Prevo's, Sharp agreed to a medical examination by an infectious disease expert at the company's expense. Prevo's made an appointment for Sharp with David Baumgartner, M.D., in Grand Rapids, for November 19, 1993. Prevo's requested that Dr. Baumgartner provide a complete diagnosis and prognosis concerning whether Sharp tested positive for HIV, hepatitis or any related conditions; an opinion concerning whether future treatment would require Sharp to be absent from work; an opinion concerning whether Prevo's should consider assigning Sharp to office work; an opinion regarding the transmittal of HIV on tools and produce; and an opinion concerning the degree of risk Sharp posed to customers and co-workers in the produce position. Sharp did not attend the appointment, claiming he had no transportation to get to the doctor's office. Instead, Sharp saw his own physician who provided a simple opinion that Sharp tested negative for tuberculosis and hepatitis; the tests administered to Sharp by his own physician did not reveal whether Sharp was HIV-positive.

At the same time Prevo's was setting up Sharp's appointment, Prevo's also offered alternative employment to Sharp that would have entailed working at home developing marketing information by computer. Sharp wrote to Prevo's to decline the at-home marketing position. Attached to Sharp's letter of refusal was a letter from his physician stating that Sharp tested negative for hepatitis and tuberculosis. Prevo's rejected the letter from Sharp's physician because it did not provide the requested information about Sharp's diagnosis, prognosis, or suitability for employment.

On December 3, 1993, Prevo's human resources coordinator called Sharp regarding the missed appointment in order to find acceptable dates on which Sharp could be examined. The coordinator gave Sharp twenty-four hours in which to advise Prevo's of an acceptable date to reschedule the doctor's appointment. The coordinator also told Sharp that failure to respond would be interpreted as a refusal to have the examination. When Sharp failed to call back with an acceptable date, Prevo's terminated his employment. The termination ended nearly a year during which Sharp received paid leave and medical benefits.

## II. Procedural Background

After a period of discovery, Prevo's and the EEOC filed cross-motions for summary judgment on the issue of liability for violating the ADA. The district court granted the EEOC's motion and held that Prevo's had discriminated against Sharp in violation of the ADA. The court cited 42 U.S.C. § 12112(d)(4)(A) which provides as follows:

> (A) Prohibited Examination and Inquiries
>
> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and extent of the disability, unless such examination is shown to be job-related and consistent with business necessity.

Prevo's contended that a medical examination was appropriate in this case to determine whether Sharp could continue to safely perform his job duties without risk of exposing others to HIV or other diseases to which Sharp may have been susceptible. The dis-

---

**3.** Produce clerk duties include trimming and packaging produce for sale to the public. At Prevo's the trimming and preparation is performed in a small area. At times, there are up to six clerks working in the produce department. In the course of their duties, clerks use a variety of cutting instruments such as paring knives, chef knives, cleavers and pineapple corers, all of which are shared by the clerks.

**4.** According to the EEOC, Prevo's initially wanted Sharp to confirm his HIV status, but later requested additional information about other conditions related to HIV.

trict court noted that Sharp's situation was outside of the typical circumstances that called for medical examinations as outlined in the ADA Technical Assistance Manual. The court also distinguished the cases cited by Prevo's in support of its motion for summary judgment, most notably *Leckelt v. Board of Commissioners of Hosp. Dist. No. 1*, 909 F.2d 820 (5th Cir.1990), on the grounds that the cases cited by Prevo's involved hospital employees whose risk of exposure to patients was greater than the risk of exposure in the produce department setting.

The medical testimony before the court consisted of depositions of Sharp's doctor and Prevo's doctor. Sharp's medical expert witness testified that the general risk of Sharp transmitting the disease to a co-worker or customer was one in ten million. If direct blood-to-wound contact occurred, the risk would increase to one in three thousand.[5] Prevo's doctor, who had not examined Sharp, did not testify in terms of specific odds of transmission; rather he spoke more generally about the risks involved in exposure of open wounds to contaminated blood. There was testimony that the already low risk of transmission could be further reduced by proper hygiene procedures.[6] In light of this evidence, the district court concluded·that inquiries into Sharp's health and a demand for a medical examination were not strictly necessary. The court concluded that it was unlawful, therefore, for Prevo's to suspend and discharge Sharp for failure to undergo a medical examination.

The issue of damages was tried to a jury, which awarded Sharp $10,000 in compensatory damages and $45,000 in punitive damages. The district court also ordered reinstatement of Sharp to his former position in the produce department along with back pay and, pending reinstatement, payment of Sharp's usual wages of $192.50 per week. Prevo's posted $100,000 supersedeas bond, and the district court approved a stay of the monetary damages judgment but did not stay the order of reinstatement. Prevo's filed a Mo-

tion for Stay of Reinstatement Order Pending Appeal, which we granted in March of 1997.

We find the medical examination of an alleged HIV positive employee, in the unique circumstances of this particular case, to be job-related and consistent with a business necessity. As such, we do not reach a determination of punitive damages, though it appears that the employer's behavior in this instance was not sufficiently unreasonable or malicious to justify an award of punitive damages in any event.

## III. Standard of Review

This court reviews the district court's grant of summary judgment *de novo*. *Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Viewing the evidence in the light most favorable to the nonmoving party, the court must determine whether the evidence presents a sufficient disagreement to require submission to the factfinder or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

## IV. Discussion of Liability

*Medical Examination Must Be Job–Related and Consistent with Business Necessity*

The Americans with Disabilities Act protects "qualified individuals with a disability" from discrimination based on their disability. 42 U.S.C.A. § 12112(a). The prohibition

---

5. The hypothetical used to bring out this figure involved an HIV-positive person bleeding directly into an open wound of an uninfected person.

6. Hygiene procedures that could have minimized the risk of transmission include: (1) wearing protective, steel-lined gloves; (2) using an individual set of knives and other utensils; and (3) enhanced clean-up procedures.

against discrimination referred to in section (a) includes medical examinations and inquiries. 42 U.S.C.A. § 12112(d)(1). Once an individual has been hired, the statute provides as follows:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and extent of the disability, unless such examination is shown to be job-related and consistent with business necessity.

42 U.S.C.A. § 12112(d)(4)(A).

■ The statute clearly permits medical examinations, but only in certain limited circumstances. The focus is on the nature of job-relatedness and what constitutes a business necessity. The interpretative guidelines to the ADA explain that the statute was intended to prevent against "medical tests and inquiries that do not serve a legitimate business purpose." 29 C.F.R. § 1630.13(b) App. (1996).[7] The regulations provide an example of prohibited medical examination: "[I]f an employee suddenly starts to use increased amounts of sick leave or starts to appear sickly, an employer could not require that employee to be tested for AIDS, HIV infection, or cancer unless the employer can demonstrate that such testing is job-related and consistent with business necessity." _Id._ The hypothetical of prohibited action by an employer is factually different from the case before us. Prevo's legitimate business purpose and business necessity was to protect the health of Sharp, its other employees and the general public from HIV infection. Because of the frequency of bleeding in the produce area, Prevo's needed to verify Sharp's medical condition, determine whether he had other conditions associated with HIV, and determine whether he was aware

of and able to follow safety procedures to reduce or eliminate any risk of infection. HIV is a blood borne pathogen and can be transmitted in an environment such as that of a produce department of a grocery store, where one is susceptible to cuts and scrapes on a regular basis. Sharp himself was prone to cuts and scrapes through the use of knives in preparing produce and scraping himself against stapled produce boxes. He acknowledged that "[m]any times the cleaning and sanitation of the knives [was] not done from one item to the next as it should have been done." (J.A. at 61.) Sharp also admitted there were probably times he did not clean knives after using them. There was also testimony that it was not uncommon for Prevo's workers to have several lacerations at the same time. Dan Prevo, who had once worked in the produce department, gave testimony that employees shared knives and, at times, knives on which one had bled.

Furthermore, Prevo's behavior is not based on a mere suspicion that Sharp may be sick. Rather, Sharp has directly communicated his alleged HIV status to Prevo's. This is not the sort of unfounded and biased discrimination that the ADA was created to prevent.[8] Instead, Prevo's actions were based on Sharp's statements and Prevo's concerns about the health and safety measures needed to prevent further infection.

At the same time, the employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement. If this were not the case, every employee could claim a disability warranting a special accommodation yet deny the employer the opportunity to confirm whether a need for the accommoda-

---

7. In _Gilday v. Mecosta County_, 124 F.3d 760, 766 (6th Cir.1997) (Kennedy, J., concurring in part, dissenting in part), it was suggested that the appendix to the ADA is only interpretive and is not binding law. Without addressing this issue, we find that the guidelines constitute helpful interpretations in this case.

8. Part of the concern of the Congress in creating the ADA and the ability of employers to require employees to undergo medical examinations was the unwanted exposure of the employee's disabil-

ity and the stigma it may carry. Chai R. Feldblum, _Medical Examinations and Inquiries Under the Americans with Disabilities Act: A View from the Inside_, 64 Templ.L.Rev. 521, 539 (1991), citing H.R.Rep. No. 485 101st Cong.2d Sess. pt. 3 at 26; S.Rep. No. 116, 101st Cong. 1st Sess. (1990). In the present case, Sharp has already identified himself to Prevo's as HIV positive and planned to identify himself further by discussing HIV and AIDS at a local high school.

tion exists. We believe the purpose of the ADA was not to create impediments for such employer-employee co-operation, but to promote an interactive dialogue between an employer and employee to discover to what extent the employee is disabled and how the employee may be accommodated, if at all, in the workplace.

### Determination of a Direct Threat

Next, Prevo's argues that in order to determine whether Sharp posed a direct threat to the health and safety of other workers, it was authorized to require Sharp to undergo a medical examination of his condition. The EEOC argues that a medical opinion as to Sharp's direct threat was necessary prior to the medical examination, and that medical testimony showed the risk of transmission to be so low that a medical examination to determine the existence of a direct threat was unnecessary.

The statute allows employers to require as a qualification for employment that the disabled individual does not pose a "direct threat to the health or safety of other individuals in the workplace." 42 U.S.C.A. 12113(b); 29 C.F.R. 1630. 15(b)(2) (1996). "Direct threat" is defined as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C.A. § 12111(3); 29 C.F.R. 1630.2(r) (1996). Even if an employee is a direct threat, as long as a reasonable accommodation can be made to eliminate that threat, the employee may remain employed. *Id.* The Code of Federal Regulations further provides:

> The determination that an individual poses a "direct threat" shall be based on an individual assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;

> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. 1630.2(r) (1996).

The information sought via the medical examination was whether Sharp could safely perform the function of his job involving cuts and scrapes without exposing others to HIV infection. The EEOC contends that this information can be obtained without a medical examination, either by consulting health care officials or by simply asking Sharp himself, and that the determination of the necessity of a medical examination is to be made by consulting a health care official before demanding that the employee undergo a medical examination. At trial, the EEOC presented the testimony of its expert medical witness, Dr. Rodger MacArthur, who stated that a medical examination would be an opportunity to evaluate Sharp's intellect and personal hygiene; an opportunity to assess Sharp's understanding of how the condition can be transmitted and to determine whether Sharp is acquainted with universal precautions for preventing transmission. Dr. MacArthur also stated that it would be reasonable for an employer to be concerned about an HIV positive employee in the workplace. The EEOC also pointed out that the testimony of Prevo's medical expert, Dr. David Baumgartner, was that a medical examination of Sharp rises only to the level of being beneficial in determining the risks he posed and not a necessity as construed by the ADA. The EEOC contends Dr. Baumgartner explained that a medical examination of an HIV positive employee would be necessary only if the employee has uncontrolled diarrhea or sufficiently advanced dementia to hamper short-term memory and the ability to maintain personal hygiene, and that there was no evidence that Sharp fell into either of these categories. However, a review of the record reveals Dr. Baumgartner equated the issue of bleeding and lack of maintenance of hy-

giene.[9]  Furthermore, Dr. Baumgartner agreed that assuming there is bleeding occurring on a regular basis, he could not render an opinion as to whether Sharp could have remained working in the produce department without examining him. (J.A. at 179.)  Therefore, we do not believe Dr. Baumgartner limited his testimony to individuals who have uncontrollable diarrhea and HIV induced dementia.

The EEOC argues that the medical examination to determine whether Sharp posed a direct threat was unwarranted under *Leckelt* because in his position as a produce clerk, Sharp posed a low risk of transmitting HIV to his co-workers or customers.  The district court also noted that *Leckelt* was inapplicable because "the risk of spreading [HIV] to co-workers is extremely small and that the risk of spreading [HIV] to customers is negligible."[10]  However, as Prevo's points out, *Leckelt* held that the probabilities of the transmission of an infectious disease is just one of four factors to be considered.[11]  Yet, it is the existence of exposure and transmission opportunities that are instrumental in determining if a medical examination is necessary. *Leckelt*, at 829.  As in *Leckelt*, we are dealing with a profession and environment in which there is continuous blood exposure.  It is undisputed that Sharp's condition presented potential transmission opportunities.  Sharp testified himself to scrapes, cuts, and puncture wounds incurred regularly in the course of his employment.  Additional testimony was heard on the sharing of cutting utensils, some of which were not properly cleaned; and Sharp, again, testified he was sure at times he did not properly clean his knives.

As in *Leckelt*, Sharp's refusal to provide necessary medical information from his own physician, then his refusal to submit to a company-paid examination prevented Prevo's from ever knowing Sharp's HIV status and from deciding what, if any, measures were necessary to protect the health of Sharp, other Prevo's employees and Prevo's customers.  Indeed, Sharp prevented Prevo's from knowing whether he had a condition for which federal law may require accommodation.  In fact, it is unknown by all of the parties that have ever been associated with this case whether Sharp is HIV positive.[12]

Furthermore, Prevo's is simply a grocery store chain.  There is no evidence that Prevo's has within its organization, access to "the most current medical knowledge" as required by the statute.  Therefore, Prevo's needed to contact a third party to obtain a medical examination of Sharp to confirm his HIV status and to determine what steps were necessary concerning Sharp's employment.  The EEOC contends Prevo's could have obtained this information from a health care source without an examination of Sharp or by simply asking Sharp.  As we stated

---

**9.**  In arguing that Dr. Baumgartner did not believe a medical examination was necessary, the EEOC points to a letter from Baumgartner to Prevo's attorneys discussing his testimony.  In this letter Baumgartner states that under ordinary circumstances an HIV infected person working in a food service area does not pose any threat of transmission and needs no restriction in employment.  (J.A. at 194.)  The exception to this rule is if the individual was suffering from an illness that interferes with his personal hygiene.  *Id.*  Baumgartner gives two examples, those being intractable diarrhea and any neurological disease like HIV related dementia.  *Id.*  He then states that bleeding would be a threat and that if these factors were playing a role, then a medical examination would be of benefit.  *Id.*

**10.**  *Equal Employment Opportunity Commission v. Prevo's Family Market, Inc.*, 1996 WL 604984 (W.D.Mich.1996).

**11.**  *Leckelt* held that "in the context of the employment of a person handicapped with a contagious disease, ... [the "otherwise qualified"] inquiry should include: '[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature if the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm" *Leckelt*, 909 F.2d at 829 (5th Cir.1990) citing *School Board of Nassau County v. Arline*, 480 U.S. at 287–89, 107 S.Ct. at 1131.

**12.**  Although both parties have regarded Sharp as disabled, his condition remains a mystery.  The district court's finding that Sharp is HIV positive is based solely on Sharp's word.  1996 WL 604984, *2, FN2.  The district court's finding may be regarded as suspect in view of the lengths to which Sharp has gone to avoid a medical evaluation of his HIV status.

earlier, there was evidence at trial that the type of assessment authorized in the statute and regulation of an employee in an environment in which there was bleeding could not have been made without a medical examination. Nor do we believe Sharp himself could answer the four factors suggested by the statute. There was testimony at trial that Dan Prevo initially consulted Spartan Stores to ask if they had any experience in employing an HIV positive employee.[13] However, nothing in the record indicates Spartan could provide Prevo's with anything other than information of a general nature rather than an individualized assessment specific to Sharp and the operations at Prevo's. As Prevo's contends, the EEOC's argument would impose upon Prevo's a duty to become an expert in the field of HIV transmission and control. We do not believe the statute and regulation impose such a burden.

The EEOC argues the regulation must be read in light of its purpose. We agree that the principal purpose of the regulation is to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics. 29 C.F.R. Pt. 1630 App. (1996). However, we find that the language of the regulation is instructive on how to discover an individual's actual characteristics of disability; and in order to understand those characteristics under these particular circumstances, a medical examination was needed.

Furthermore, we do not believe Prevo's actions rise to the level of "adverse employment decisions based on stereotypes and generalizations." *Id.* Prevo's made a concerted effort to continue employing Sharp and at the same wage and time scale. When Sharp disclosed his alleged HIV condition, he was moved to a position located only a few feet away from his previous one. He continued to receive the same pay and benefits. When Prevo's placed Sharp on leave, it was paid leave, a benefit to which, as a part time employee, Sharp was not entitled; nor was

Sharp entitled to the benefits Prevo's continued to provide. Finally, after nearly a year of paid leave and after repeated promises by Sharp to provide medical information from his personal doctor, Sharp skipped the medical examination Prevo's had scheduled and for which it offered to pay. Yet, Prevo's extended Sharp another job offer as a data analyst. None of Prevo's actions rises to the level of discrimination guarded against by the statute.

Another portion of Prevo's argument is that Sharp represents a direct threat to the health and safety of others in the workplace and there can be no reasonable accommodation for him, thereby justifying his dismissal. Because we do not have in the record whether Sharp is indeed, HIV positive, we will not address this part of Prevo's argument. However, we do not need to reach that issue in order to reverse the summary judgment order imposed by the district court.

### V. Punitive Damages

Because we have found that Prevo's did not discriminate against Sharp in violation of the ADA, we do not reach the merits of the punitive damage claim. However, we briefly outline our finding of insufficient evidence to justify such an award.

At no time during the course of this case did Prevo's actions rise to the level of intentional or careless conduct. When Sharp informed Prevo's of his condition, Prevo's continued to employ Sharp, placing him in a similar position and with the same pay and benefits. Prevo's did not act out of malice but acted according to what it reasonably perceived as being job-related and a business necessity. When Sharp expressed that he was unhappy with his position, Prevo's and Sharp agreed to place Sharp on paid leave. Prevo's also provided Sharp with paid medical benefits to which he was not entitled as a part-time employee. In the meantime, Sharp promised to provide Prevo's with the needed medical information from his own physician. Even when Sharp failed to provide the information, Prevo's continued to

**13.** Spartan Stores, Inc., is a grocery wholesaler owned by the grocery stores it serves. Spartan makes available to the stores specialized knowledge in various area such as marketing, advertising and human resources.

pay his wages and medical insurance. Sharp consented to undergo the medical examination at company expense after consulting his attorney.

The EEOC contends that the award of punitive damages should be upheld for the reason that Prevo's violated the ADA by asking Sharp to submit to a medical examination and then suspending him. We do not believe a reasonable juror would conclude Prevo's exhibited any malicious or reckless behavior warranting a punitive damage award in Sharp's favor. We note that Sharp agreed to the paid leave of absence and only sought legal recourse for the medical examination requirement after he was fired. The EEOC argues that the employer had a duty to obtain the current medical knowledge in order to determine whether they could ask Sharp to submit to a medical examination, yet Prevo's allowed 10 months to pass, then fired Sharp for not producing the medical information. However, it was Sharp who continued to tell Prevo's he would soon provide them with the information from his own doctor. Even if what occurred in this case were a violation of the ADA, we do not believe a reasonable juror would conclude that it was reckless behavior on the part of Prevo's to ask Sharp to provide medical information from his personal doctor. Contrary to the EEOC's argument, not every violation of the ADA is reckless; and, again, we find no violation of the ADA by the employer under the circumstances of this case.

## VI.  Conclusion

Based on the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of the EEOC on the issue of liability and enter summary judgment in favor of Prevo's, holding that it did not violate the ADA in its treatment of Sharp. Accordingly, we VACATE the award of compensatory damages, back pay, prejudgment interest and reinstatement. Having found no liability on the part of Prevo's, we do not determine whether its actions warrant an award of punitive damages; therefore, we VACATE the district court's award of punitive damages.

MOORE, Circuit Judge, dissenting.

I respectfully *dissent from the majority* opinion because I believe that the Americans With Disabilities Act prohibited Prevo's Market from requiring Sharp to submit to a medical examination under the circumstances of this case.

## I.  *Introduction*

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., ranks as one of the most important civil rights statutes passed in this century. Among other things, the ADA protects millions of disabled Americans from discrimination in employment.. Like other great civil rights statutes, prior to its passage the ADA was subject to last minute amendments that threatened to limit severely the size of its protective umbrella. Representative Chapman offered one such amendment. His proposed amendment provided as follows:

> (d) Food Handling Job. It shall not be a violation of this act for an employer to refuse to assign or continue to assign any employee with an infectious or communicable disease of public health significance to a job involving food handling, provided that the employer shall make reasonable accommodation that would offer an alternative employment opportunity for which the employee is qualified and for which the employee would sustain no economic damage.

136 Cong. Rec. H2471–01, 2478 (daily ed. May 17, 1990). While acknowledging that the Centers for Disease Control ("CDC") has never found a case where Acquired Immune Deficiency Syndrome ("AIDS") or Human Immunodeficiency Virus ("HIV") had been transmitted by an infected worker handling food, he nevertheless argued that "[t]he reality is that many Americans would refuse to patronize any food establishment if an employee were known to have a communicable disease." *Id.* (statement of Rep. Chapman). Reinforcing the perception-is-reality theme, Senator Jesse Helms asserted that "[r]estaurant patrons are likely to steer clear of any food service establishment having an employee handling food who is known to have AIDS

or any other communicable disease. Despite the fact that available evidence indicates that certain diseases, including AIDS, cannot be transmitted in the process of handling food, that evidence is far from persuasive to many people." 136 Cong. Rec. S7422–03, 7436 (daily ed. June 6, 1990) (statement of Sen. Helms).

Many members of Congress rose in opposition to this amendment. Representative John Lewis lamented that "[t]wenty-five years after the passage of the major civil rights legislation of the 1960's, we are still hearing the same tired arguments that were used to justify segregated restaurants. They have been dusted off and used again to defend discrimination." 136 Cong. Rec. H2471–01, 2481 (daily ed. May 17, 1990) (statement of Rep. Lewis). Representative Miller declared that "[t]he sponsor admits there is no evidence that AIDS can be transmitted in food handling, but his amendment allows discrimination in such cases because food handling businesses may be hurt by public perception of AIDS victims. . . . This may be true. But this is as if businesses 40 years ago had pointed to the public perception of blacks and said our customers will not understand our hiring blacks, so allow us to discriminate against blacks. Nonsense. This Congress should not license discrimination of any kind." *Id.* at 2481 (statement of Rep. Miller). Senator Harkin protested that "[t]o pass legislation . . . in spite of the clear

and convincing, overwhelming medical evidence that AIDS cannot be transmitted either through air or food is simply to codify ignorance." 136 Cong. Rec. S7422–03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin). Senator Harkin also noted "[t]he thesis of the Americans With Disabilities Act is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged based upon the relevant medical evidence and the abilities they have." *Id.*

Rather than succumb to the pressures of codifying "fear, prejudice, [and] ignorance," Congress instead adopted an alternative amendment proposed by Senator Orrin Hatch. That amendment charged the Secretary of Health and Human Services with the responsibility of preparing a list of infectious and communicable diseases that could be transmitted through food handling. For those diseases, employers would be able to reassign infected employees. Congress adopted this amendment as part of the ADA.[1] In so doing, Congress chose facts over fear, information over ignorance, and medicine over mythology.

Since the 1990 enactment, neither HIV nor AIDS has ever appeared on the list of infectious diseases that could be communicated through the handling of food.[2] Yet, despite

1. 42 U.S.C. § 12113(d) reads as follows:
    (d) List of infectious and communicable diseases
    (1) In general
    The Secretary of Health and Human Services, not later than 6 months after July 26, 1990, shall—
    (A) review all infectious and communicable diseases which may be transmitted through handling the food supply;
    (B) publish a list of infectious and communicable diseases which are transmitted through handling the food supply;
    (C) publish the methods by which such diseases are transmitted; and
    (D) widely disseminate such information regarding the list of diseases and their modes of transmissibility to the general public.
    Such list shall be updated annually.
    42 U.S.C. § 12113(d)(2) then provides that when an individual has an infectious or communicable disease on the list, "which cannot be eliminated by reasonable accommodation, a cov-

ered entity may refuse to assign or continue to assign such individual to a job involving food handling."

2. Below is the most current list (published by the CDC as part of the Department of Health and Human Services on September 22, 1997) of diseases transmitted through the food supply:

I. Pathogens Often Transmitted by Food Contaminated by Infected Persons Who Handle Food, and Modes of Transmission of Such Pathogens
    The contamination of raw ingredients from infected food-producing animals and cross-contamination during processing are more prevalent causes of foodborne disease than is contamination of foods by persons with infectious or contagious diseases. However, some pathogens are frequently transmitted by food contaminated by infected persons. The presence of any one of the following signs or symptoms in persons who handle food may indicate infection by a pathogen

this medical evidence to the contrary, the majority opinion effectively adopts, as the law of this circuit, the Chapman amendment and the fear, prejudice, and ignorance it represented.

## II. *Direct Threat*

The Chapman amendment would have authorized employers to reassign to a non-food-handling position any food-handling employee who had a communicable or infectious disease. The employer could do so without relying on any medical evidence that the employee in fact posed a direct threat to co-workers or customers. Similarly, in this case, the majority holds that Prevo's Market could immediately reassign Sharp to a non-food-handling position without any reference to any medical evidence that Sharp in fact posed a direct threat to his co-workers or customers. The majority further holds that after reassignment, Prevo's could then require Sharp to submit to a medical examination in order to confirm that he in fact posed a direct threat to others.

I disagree with both of the majority's holdings for two reasons. First, I believe that an employer must have some relevant objective medical evidence that a food-handling employee poses a direct threat to others prior to reassigning that employee to a non-food-handling position. *See* H.R.Rep. No. 101–485(III), at 45 (1990), U.S. Code Cong. & Admin. News at 445, 468 ("The purpose of creating the 'direct threat' standard is to eliminate exclusions which are not based on objective evidence about the individual involved."). Second, an employer can conduct the direct-threat analysis based on objective medical evidence without requiring the employee to submit to a medical examination.

### A. Reassignment

With respect to reassignment, in *Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1,* 909 F.2d 820 (5th Cir.1990), a hospital administrator received word that a nurse was an associate of a patient with AIDS. The administrator immediately launched an investigation into the matter. However, *before* taking *any* action in regard to the nurse, the administrator consulted legal counsel and reviewed the hospital's infection control policies and the applicable guidelines concerning HIV and AIDS promulgated by the CDC and the American Hospital Association. *Id.* at 822. Based on this information, the hospital administrator then took action in regard to the nurse.

In contrast, here, Dan Prevo admits he took no steps to obtain relevant objective medical evidence as to whether he needed to reassign Sharp. J.A. at 127 (Prevo Dep.). Prevo could have contacted the CDC, an

---

that could be transmitted to others through handling the food supply: diarrhea, vomiting, open skin sores, boils, fever, dark urine, or jaundice. The failure of food-handlers to wash hands (in situations such as after using the toilet, handling raw meat, cleaning spills, or carrying garbage, for example), wear clean gloves, or use clean utensils is responsible for the foodborne transmission of these pathogens. Non-foodborne routes of transmission, such as from one person to another, are also major contributors in the spread of these pathogens. Pathogens that can cause diseases after an infected person handles food are the following:

    Hepatitis A virus
    Norwalk and Norwalk-like viruses
    Salmonella typhi
    Shigella species
    Staphylococcus aureus
    Streptococcus pyogenes

II. Pathogens Occasionally Transmitted by Food Contaminated by Infected Persons Who Handle Food, but Usually Transmitted by Contamination at the Source or in Food Processing or by Non–Foodborne Routes

Other pathogens are occasionally transmitted by infected persons who handle food, but usually cause disease when food is intrinsically contaminated or cross-contaminated during processing or preparation. Bacterial pathogens in this category often require a period of temperature abuse to permit their multiplication to an infectious dose before they will cause disease in consumers. Preventing food contact by persons who have an acute diarrheal illness will decrease the risk of transmitting the following pathogens:

    Campylobacter jejuni
    Entamoeba histolytica
    Enterohemorrhagic Escherichia coli
    Enterotoxigenic Escherichia coli
    Giardia lamblia
    Nontyphoidal Salmonella
    Rotavirus
    Taenia solium
    Vibrio cholerae 01
    Yersinia enterocolitica

*See* 62 Fed.Reg. 49518 (Sept. 22, 1997).

AIDS/HIV information organization, or an infectious disease specialist. In fact, Sharp gave him the names of several organizations to call and the name of Sharp's personal physician——an infectious disease specialist. J.A. at 93–94 (Sharp Dep.). Rather than follow up on this information, Prevo merely spoke with his neighbor, Dr. Tom Bannow, who is not an infectious disease specialist, and to human resource personnel, none of whom were doctors or who specialized in AIDS/HIV in the workplace. J.A. at 277–81 (Prevo Test.). Despite not having any relevant objective medical evidence regarding whether Sharp presented a direct threat to others, Prevo reassigned Sharp to the receiving department and then placed him on paid administrative leave.[3]

The fact that Prevo reassigned Sharp without any legal or medical basis leads to the inescapable conclusion that he did so out of fear, prejudice, and ignorance whether it was his own or that of his customers. In fact, in his deposition, Prevo testified that he mentioned to Sharp that people would be concerned that he was handling fresh produce. J.A. at 124 (Prevo Dep.). He further testified that once Sharp disclosed his HIV+ status, he "wouldn't allow [Sharp] to go into produce...." J.A. at 125 (Prevo Dep.). He would not "allow" Sharp to work in produce despite acknowledging that he did not have any medical information for making that decision. J.A. at 125. In the absence of relevant objective medical information, Prevo's assumed that reassigning Sharp was the prudent thing to do. Yet, our assumptions often find comfort in our fears, prejudices, and ignorance. In turn, our fears, prejudices, and ignorance often manifest themselves in discriminatory conduct. And it is this discriminatory conduct that the ADA was specifically designed to address. *See, e.g., Arline*, 480 U.S. at 284, 107 S.Ct. at 1129 (1987) ("Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.").

Like the Chapman amendment eventually rejected by Congress, the majority opinion fails to require an employer to obtain relevant objective medical information *prior* to reassigning an HIV infected food-handling employee to a non-food-handling position. In so doing, the majority allows the fear, prejudice, and ignorance that produced that amendment to fester unabated.

## B. Required Medical Examination

In addition to allowing Prevo to act on fear, prejudice, and ignorance by summarily reassigning Sharp, the majority reinforces this discriminatory conduct by allowing Prevo's to require Sharp to submit to a medical examination in order to determine whether he poses a direct threat to others. A "direct threat" is defined as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also* 29 C.F.R. § 1630.2(r) (1997). The majority correctly notes that "[e]ven if an employee is a direct threat, as long as a reasonable accommodation can be made to eliminate that threat, the employee may remain employed." *Maj. slip op.* at 1095 (citing *id.*).

According to the EEOC's regulations:

The determination that an individual poses a 'direct threat' shall be based on an indi-

---

3. The majority states that requiring Prevo's to obtain information before reassigning Sharp "would impose upon Prevo's a duty to become an expert in the field of HIV transmission and control." *Maj. slip op.* at 1097. On the contrary, such a requirement is designed to ensure that employers are acting on fact rather than fear, information rather than ignorance, and medical evidence rather than mythology. As the Supreme Court explained, "[t]he Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284–85, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (discussing § 504 of the Rehabilitation Act, the precursor to the ADA). After all, if Prevo wanted to expand his store, he would first call an architect, contractor, and engineer before allowing the construction crew to begin working. Yet, making those telephone calls would not make him an expert in architecture, construction, or engineering. Instead, those telephone calls would provide him with information to make rational rather than rash decisions.

vidualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.

29 C.F.R. § 1630.2(r) (1997). In making this individual assessment, an employer must consider the following four factors: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.*

According to the majority, Prevo's could require Sharp to submit to a medical examination in order to make an individualized assessment in considering these four factors. Yet there is simply no need for a medical examination in order to consider these factors because ample objective medical evidence exists showing that he does not pose a direct threat. *See, e.g., Den Hartog v. Wasatch Academy,* 129 F.3d 1076, 1090 (10th Cir.1997) (explaining that "29 C.F.R. § 1630.2(r) does not require an independent medical examination when the available objective evidence is clear. It uses the conjunctive 'and/or' between medical knowledge and objective evidence.").

Dr. MacArthur, EEOC's infectious disease expert, testified in his deposition that once infected with HIV, a person remains infected forever. J.A. at 150–51 (MacArthur Dep.). He further testified that the disease is ultimately fatal. J.A. at 157 (MacArthur Dep.). Thus, the only issues left to resolve under the four-factor test are the likelihood that the potential harm will occur and the imminence of the potential harm. The answers to these questions are context-specific; one would need to consider the environment in which the infected employee works in order to evaluate these factors.

No one disputes that Sharp works in an environment where there are cuts, scrapes, and bleeding. Yet, according to Dr. Baumgartner, the expert of Prevo's, "under ordinary circumstances, a human immunodefici-

ency virus (HIV) infected individual working in a food service area does not pose any threat of transmission of infection and needs no restriction in employment." J.A. at 194 (Letter from Dr. Baumgartner to Lubben, attorney for Prevo's, of 5/9/96, at 1). Granted, "it would be inadvisable for bleeding to occur as a regular part of the job," but "[h]ad medical evaluation been pursued, it is quite likely that the recommendation would have been for no restrictions on the job." *Id.* Moreover, Dr. MacArthur, in his deposition, testified that the odds of Sharp infecting a fellow produce worker were one in ten-million under normal circumstances. J.A. at 159. (MacArthur Dep.).[4] By comparison, he testified that infection of a patient by an HIV+ surgeon with her hands in the body cavity of the patient would be anywhere from one in forty-thousand to one in four-hundred-thousand depending on the study. J.A. at 158.

The expert testimony suggests that the risk of infection to Sharp's co-workers is not significant. As a result, he does not present a direct threat to any of them. Yet, even if he did present a direct threat, he is still a "qualified worker" if he can be reasonably accommodated. 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r) (1997). There is no dispute that providing Sharp with steel gloves and his own separate knives were reasonable accommodations that would further reduce the likelihood and imminence of transmission. *Maj. slip op.* at 1093 & n. 6.

All of this expert testimony emphasizes the point that likelihood and imminence of infection could be determined without resort to a medical examination of Sharp. The majority focuses on parts of the testimony where both experts suggest that a medical examination would have been beneficial primarily to determine Sharp's intellect and personal hygiene habits. However, neither Dan Prevo nor anyone else had observed or reported any aberrations in Sharp's intellect or personal hygiene habits. Thus, Prevo's had no foundation for believing that a personalized medical examination of Sharp was necessary

---

**4.** He posited the fanciful hypothetical that if one of Sharp's co-workers had a fresh cut on his hand, held the wound wide open, and Sharp bled directly into it, then the likelihood of transmission would increase to one in three-thousand. J.A. at 160.

to conduct the direct-threat analysis. From the foregoing analysis, I conclude that it is not.

### III. *Job–Related/Consistent with Business Necessity*

In addition to requiring Sharp to submit to a medical examination for the direct threat analysis, the majority also holds that a medical examination was job-related and consistent with business necessity. *Maj. slip op.* at 1093. However, the ADA provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). *See also* 29 C.F.R. §§ 1630.13(b) and 1630.14(c). Job-related and consistent with business necessity requires that the medical test serve a "legitimate business purpose." S.Rep. No. 101–116, at 39 (1989); H.R.Rep. No. 101–485(II), at 75 (1990), U.S. Code Cong. & Admin. News at 303, 357; H.R.Rep. No. 101–485(III), at 44 (1990), U.S. Code Cong. & Admin. News at 445, 466; 29 C.F.R. pt. 1630, App. §§ 1630.13(b), 1630.14(c) (1997) (Interpretive Guidelines).[5] According to the majority, "Prevo's legitimate business purpose and business necessity was to protect the health of Sharp, its other employees and the general public from HIV infection. Because of the frequency of bleeding in the produce area, Prevo's needed to verify Sharp's medical condition, determine whether he had other conditions associated with HIV, and determine whether he was aware of and able to follow safety procedures to reduce or elimi-

nate any risk of infection." *Maj. slip op.* at 1094.

The recognized legitimate business purposes are as follows: (1) when an employee is having difficulty performing his or her job effectively; (2) when an employee becomes disabled on the job or wishes to return to work after suffering an illness; (3) if an employee requests an accommodation; and (4) if medical examination, screening, and monitoring is required by other laws. *See* ADA Technical Assistance Manual, Chap. VI, 12–14 (1992), *cited in* Dist. Ct. Op. at 5 (8/27/96), J.A. at 24. *See also* S.Rep. No. 101–116, at 39; H.R.Rep. No. 101–485(II), at 75 and (III), at 44; *Yin v. California,* 95 F.3d 864, 868 (9th Cir.1996) (requiring medical examination where employee had difficulty performing job); *Rodriguez v. Loctite Puerto Rico, Inc.,* 967 F.Supp. 653, 661–62 (D.P.R. 1997) (requiring medical examination where employee cited medical condition in requesting a two-month leave of absence); *Judice v. Hospital Serv. Dist. No. 1,* 919 F.Supp. 978 (E.D.La.1996) (requiring medical evaluation for doctor seeking reinstatement of hospital staff privileges after suffering from alcoholism). *See generally* Chai R. Feldblum, *Medical Examinations and Inquiries under the Americans With Disabilities Act: A View from the Inside,* 64 Temple L.Rev. 521 (1991) (discussing circumstances under which employers may require medical examinations of current employees).

None of the foregoing situations apply to Sharp. There is no dispute that he performed satisfactorily as a produce clerk. J.A. at 142 (Store Manager Mike Rodes Dep.). Furthermore, Sharp was not seeking to return to work after suffering illness or injury, nor was he claiming to have become injured on the job. Moreover, at no time did Sharp ever seek an accommodation.[6] Final-

---

**5.** As the majority correctly notes, in *Gilday v. Mecosta County,* 124 F.3d 760, 766 (6th Cir. 1997) (Kennedy, J., concurring in part, dissenting in part), one judge wrote that "[t]he appendix constitutes a set of interpretive, rather than legislative, rules and is, therefore, not binding law. Nevertheless, such administrative interpretations of the ADA by the enforcing agency, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* (citations

omitted) (quotations omitted). *See also id.* at 763 n. 2 (discussing weight to be given to EEOC's interpretive guidelines and noting that to the extent that interpretive guidelines interpret EEOC regulations they are controlling regarding the regulations' meaning, unless plainly wrong or inconsistent) (Moore, J.).

**6.** It is undisputed that Sharp informed his employer of his HIV+ status only in order to give Prevo's advance notice that he would be speaking about HIV at the local high school.

ly, neither Prevo's nor the majority cite to any other law that would require a medical examination in this case. Accordingly, Prevo's had no legitimate business purpose for requiring a medical examination of Sharp.

The majority holds that the legitimate business purpose of Prevo's was to protect the health of Sharp and others because of the frequency of bleeding in the produce area. This holding perpetuates discrimination by allowing Prevo's to single out Sharp. Why single out Sharp in this setting? If *everyone* cutting produce suffers from cuts, scrapes, and bleeding, and if *everyone* shares equipment and fails to follow sanitary policies, then *everyone* is at risk for *all* blood-borne pathogens. Sharp is just as much at risk of getting a blood-borne infection such as hepatitis from one of his co-workers who has hepatitis as his co-workers are of getting infected by him. In fact, Dr. Baumgartner, the infectious disease expert of Prevo's, explained that

> [I]f it was a common practice in this work setting for tools to become bloodied by employees and then if there was a risk that the tool would subsequently be used by another employee with a regular probability that the second employee would cut them self [sic] with the bloody tool, there was a risk of transmission of blood borne pathogens (including HIV). This issue *transcended HIV* however and placed *any* employee at risk for transmission of agents such as Hepatitis B and C or other agents. *I believe that that practice should have been stopped on general infection control grounds rather than due to anything unique to HIV.*

J.A. at 195 (Letter from Dr. Baumgartner to attorney Lubben of 5/9/96, at 2) (emphasis added).

Accordingly, the bleeding and sharing of tools by all employees, far from providing a legitimate business purpose for requiring a medical examination of Sharp alone, instead provides further evidence of the discriminatory intent of Prevo's in singling out Sharp because of his particular disability. If Prevo's was so concerned about the health of Sharp, his co-workers, and customers, it would have adopted safety measures applicable to *all* produce clerks to reduce the risk of transmission of *any* blood-borne pathogen. That is what fairness dictates and the law requires. *See* 29 C.F.R. pt. 1630, App. § 1630.2(r) (1997) (Interpretive Guidelines) ("An employer may require, as a qualification standard, that an individual not pose a direct threat to the health or safety of himself/herself or others. Like any other qualification standard, such a standard must apply to *all* ... employees and not just to individuals with disabilities.") (emphasis added).

### CONCLUSION

In adopting the ADA, Congress struck a balance between the right of disabled Americans to be free from discrimination in the workplace, and the right of employers to protect the health and safety of their employees and customers. Attacking the Chapman amendment, Representative Weiss observed that "[t]he Chapman amendment flies in the face of the very purpose of the ADA. The ADA is designed to prohibit the kind of treatment of affected persons that this amendment specifically authorizes." 136 Cong. Rec. H2471–01, 2482 (daily ed. May 17, 1990) (statement of Rep. Weiss). The same may be said of the majority opinion. Like the Chapman amendment rejected by Congress, the majority opinion allows employers to elevate fear over facts, ignorance over information, and mythology over medicine. In so doing, the majority opinion places the oppressive weight of discrimination firmly on the side of employers and thereby destroys the balance Congress created.

For the foregoing reasons, I respectfully dissent.