RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

VELMA SUE BATES; CLAUDIA BIRDYSHAW; MARK LONG; JON TOUNGETT; CAROLYN WADE; RICHARD WHITE,
          *Plaintiffs-Appellees*,

    *v.*

DURA AUTOMOTIVE SYSTEMS, INC.
          *Defendant-Appellee*.

No. 11-6088

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 1:08-cv-29—Aleta Arthur Trauger, District Judge.

Argued: March 7, 2013

Decided and Filed: August 26, 2014

Before: BOGGS, GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Ben Boston, BOSTON, HOLT, SOCKWELL & DURHAM, PLLC, Lawrenceburg, Tennessee, for Appellant. John A. Beam, III, EQUITUS LAW ALLIANCE, PLLC, Nashville, Tennessee, for Appellees. James M. Tucker, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Ben Boston, BOSTON, HOLT, SOCKWELL & DURHAM, PLLC, Lawrenceburg, Tennessee, Robert E. Boston, Andrew S. Naylor, Tera Rica Murdock, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee for Appellant. John A. Beam, III, EQUITUS LAW ALLIANCE, PLLC, Nashville, Tennessee, for Appellees. James M. Tucker, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

    COOK, J., delivered the opinion of the court, in which BOGGS, J., joined. GIBBONS, J. (pp. 26–28), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

COOK, Circuit Judge.  In 2007, Dura Automotive Systems, Inc., ("Dura") began testing employees at its manufacturing facility in Lawrenceburg, Tennessee, for substances appearing in both illegal drugs and in prescription medications packaged with warnings about operating machinery.  Plaintiffs-appellees, none of whom has a disability under the Americans with Disability Act ("ADA"), worked at the facility and took prescribed medications for a variety of conditions.  After these employees tested positive, Dura directed the employees to disclose their medications to Freedom From Self ("FFS"), a third-party company hired to administer the drug tests.  FFS reported the machine-restricted drugs to Dura, and Dura warned plaintiffs to discontinue using the offending medications.  After retests came back positive, Dura terminated the plaintiffs' employment.

Plaintiffs filed suit in district court, alleging, among other claims, that Dura violated ADA § 102(d)(4)(A), 42 U.S.C. § 12112(d)(4)(A), which prohibits employers from requiring "medical examination[s]" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity."  The claim reduces to two essential inquiries: (1) whether the employer performed or authorized a medical examination or disability inquiry ("the regulated conduct"); and if so, (2) whether the exam/inquiry was job-related and consistent with business necessity ("the justification").  During trial, Dura moved for judgment as a matter of law on the drug-testing claims, arguing that the tests qualified as neither medical examinations nor disability inquiries.  Despite its earlier rulings deferring judgment on this point, the district court denied the motion and *sua sponte* ruled in plaintiffs' favor.  The court then submitted the justification question to the jury.

The jury found for all but one of the plaintiffs and awarded compensatory and punitive damages in excess of $870,000.[1] Dura moved for judgment as a matter of law or a new trial, renewing its opposition to the medical-examination/disability-inquiry ruling and challenging jury instructions, damages, and the verdict. The district court denied relief, and Dura appeals. We affirm in part, reverse in part, vacate the district court's judgment, and remand with instructions.

I.

*A. The Drug-Testing Policy*

Dura manufactures glass windows for cars, trucks, and buses at its Lawrenceburg facility. Between the end of 2006 and early 2007, Dura received reports of employees' drug and alcohol abuse. The facility experienced some property damage and a few workplace accidents attributable to employees' use of illegal and prescription drugs.

In response, Dura implemented a new substance-abuse policy, which appeared in the March 2007 revision of the employee handbook and a July 2007 document issued by the Human Resources Department. The new policy prohibited employees from "being impaired by or under the influence" of alcohol, illegal drugs, or legal drugs—including prescription medications and over-the-counter drugs—to the extent that employees' use of such drugs endangered others or affected their job performance. (R. 241, Substance Abuse Policy at 2–3.) Dura reserved the right to enforce its policy via employee drug testing. The new policy provided that "tests showing positive indication of drug/alcohol use will be confirmed" and that employees who tested positive could confidentially report to a medical review officer ("MRO") their use of prescription medications that may have affected their test results. Dura claims that it

---

[1]The plaintiffs in this suit originally included Willarene Fisher, whom the district court determined had a qualifying disability under the ADA. The jury ruled against her, however, and she does not appeal. Consequently, the remainder of this opinion addresses the remaining plaintiffs-appellees' claims.

designed its new policy to comply with the Tennessee Drug Free Workplace Program.[2] The parties dispute when the new policy took effect and whether Dura properly notified employees about the possibility of drug testing.

*B.  Implementation of Drug-Testing*

The actual drug-testing differed from the written policy.  In May 2007, Dura ordered a plant-wide drug screening of the Lawrenceburg facility's more than 400 employees.  Dura instructed FFS to test for twelve substances—amphetamines, barbiturates, benzodiazepines, cocaine, ecstasy, marijuana, methadone, methamphetamine, opiates, oxycodone, phencyclidine, and propoxyphene—some of which appear in prescription medications.  FFS conducted the urinalysis testing in private at the facility's technology center and reported to Dura representatives Mark Jent and Lindy Boots.  Following the results of the "instant panel" test, Boots and/or Jent sent home those employees who tested positive.

FFS followed a set protocol after non-negative instant panel tests.  First, it sent the samples to Quest Diagnostics for confirmatory testing to reveal which of the twelve substances triggered the  non-negative result and the amount of that substance in the employee's system.  Then, a Total Compliance Network MRO reviewed the chain of custody and interpreted the test results.  In reviewing the test results, MROs questioned employees about medical explanations, sometimes requesting prescription information or documentation from the employee's physician.  If the MRO determined that the employee had a valid reason for the non-negative result, including use of prescription medications, the MRO changed the final test result to negative.  FFS forwarded these results to Dura, but Dura disregarded the MRO's revisions, opting instead to prohibit any employee use of machine-restricted drugs.

---

[2]Under the Tennessee Drug Free Workplace Program, an employer may require its employees to submit to drug and alcohol testing, provided that the employer follows certain requirements, including providing employees with at least sixty days' notice before implementing the program and providing them, prior to testing, with a written statement describing the program.  Tenn. Code Ann. §§ 50-9-101(b), 50-9-105(a) & (b).

To that end, Dura instructed positive-testing employees to bring their medications to FFS for documentation. Affected employees produced their medications to FFS employee Lisa Peden, who identified the medications packaged with machine-operation warnings and reported those to Dura. Dura then informed the employees that it would terminate them if they continued to use these medications.

Plaintiffs-appellees—Velma Sue Bates, Claudia Birdyshaw, Carolyn Wade, Richard White, Mark Long, and Jon Toungett—worked at the Lawrenceburg facility when Dura instituted its new substance abuse policy. All but Toungett tested positive during the plant-wide screening, and Toungett tested positive during a "random" retest performed a few days after he informed Dura about a doctor appointment for back pain. Plaintiffs-appellees' machine-restricted medications included oxycodone, Cymbalta, Didrex, Lortrab (acetaminophen/hydrocodone), Soma, and Xanax. Though Dura warned most of these employees to discontinue using the machine-restricted medications, it called Long back to work to complete a project, only to terminate him after a "random" retest that targeted other positive-testing employees. Dura terminated the other plaintiffs-appellees after positive retests with the exception of Wade, who discontinued her medication.

No one pressed plaintiffs-appellees for their underlying medical conditions, and Dura denies questioning them directly about their medications. Dura acknowledges, however, that Peden disclosed plaintiffs-appellees' machine-restricted medications, and its safety specialist, Jent, admitted that Dura had a "blanket policy" of terminating employees who tested positive for such medications.

*C. Procedural History*

Plaintiffs-appellees sued Dura in federal district court in May 2008. Their amended complaint asserted claims under state and federal law, including the ADA. They alleged that Dura subjected them to unlawful drug testing to determine whether they took lawfully prescribed medications. They also averred that Dura refused to

reassign them and terminated them on the basis of their disabilities or perceived disabilities.

The procedural history of this case implicates two ADA provisions: (1) § 12112(d)(4)(A), which prohibits employers from requiring medical examinations or making disability inquiries of employees unless such examinations or inquiries are job-related and consistent with business necessity; and (2) § 12112(b)(6), which prohibits employers from using qualification standards, employment tests, and other selection criteria that screen out individuals with a disability or a class of individuals with disabilities unless the standard, test, or criterion is job-related and consistent with business necessity.  Plaintiffs brought their claim regarding Dura's drug testing under subsection (d)(4)(A), but the district court reclassified it as a (b)(6) claim in ruling on the parties' cross-motions for summary judgment.  Shortly thereafter, Dura asked the district court to clarify whether non-disabled plaintiffs have standing to bring a (b)(6) claim challenging an employer's job-qualification standard.  The district court ruled in favor of standing but certified the issue for interlocutory review, staying the case pending appeal.  We reversed, holding that only individuals with qualifying disabilities under the ADA could pursue a (b)(6) claim.  *Bates v. Dura Auto. Sys., Inc.* ("*Bates I*"), 625 F.3d 283, 285–86 (6th Cir. 2010).

On remand, plaintiffs moved for reconsideration in the district court, seeking reclassification of their drug-testing claim under subsection (d)(4).  The district court granted plaintiffs' motion, concluding:

> (1) the court's previous holding that the plaintiffs' claims challenging the drug testing protocol were properly asserted under Section 12112(b)(6) should not bar the plaintiffs from asserting claims under Section 12112(d)(4)(A); (2) the plaintiffs' claims 'fit' within the scope of Section 12112(d)(4)(A); and (3) the plaintiffs' lack of disability does not bar their claims here.

Thereafter, the parties filed dispositive motions on a variety of issues, with Dura challenging the availability of ADA damages for non-disabled plaintiffs and both parties

seeking judgment as a matter of law on whether Dura's test qualified as a (d)(4) medical examination or disability inquiry.  The district court denied the motions.

In July 2011 the case went to trial.  At trial, Dura moved for judgment as a matter of law, asserting that its drug testing qualified as neither a medical examination nor a disability inquiry.  The district court denied the motion, instead deciding the (d)(4) regulated-conduct issue in plaintiffs' favor.  Dura renewed its motion for judgment as a matter of law at the close of evidence.

Dura unsuccessfully objected to a jury instruction informing the jury that FFS served as Dura's agent for purposes of the drug tests.  Rejecting Dura's job-relatedness and business-necessity evidence, the jury found for plaintiffs-appellees on the (d)(4) justification issue and awarded compensatory and punitive damages.  Dura then filed a post-trial motion for judgment as a matter of law and a new trial, renewing its objections to the (d)(4) classification and jury instruction, contesting the availability of ADA damages to non-disabled plaintiffs, and challenging the sufficiency of the evidence supporting the jury's adverse verdict on the (d)(4) justification issue and punitive damages.  The district court denied Dura's motion, and Dura appeals.

II.

We begin with the district court's legal rulings on plaintiffs-appellees' (d)(4) claim, giving fresh review to its denial of Dura's motion for judgment as a matter of law. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 315 (6th Cir. 2007); *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).  "Judgment as a matter of law is appropriate when 'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.'" *Tisdale*, 415 F.3d at 527 (quoting *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)).  Though technically a moving party here, Dura's posture changed when the district court partially granted judgment as a matter of law to the plaintiffs.  Thus, while plaintiffs-appellees receive all beneficial inferences in *opposing* Dura's argument for judgment as a matter

of law, Dura likewise benefits from this standard to the extent it asserts that an issue of fact precludes judgment. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) ("Judgment as a matter of law will be granted only where a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." (citation and internal quotation marks omitted)).

Dura attacks the district court's (d)(4) classification on two fronts, first contending that a different ADA provision—subsection (b)(6), addressing qualification standards—governs plaintiffs-appellees' claim, and second arguing that the evidence does not support the court's medical-examination and disability-inquiry rulings, or at a minimum creates an issue of fact. Only the second argument has merit.

## A. Qualification Standard Under 42 U.S.C. § 12112(b)(6)

Dura correctly notes that the district court previously classified plaintiffs-appellees' claims as arising under subsection (b)(6), which prohibits employers from discriminating against disabled employees by "using qualification standards." 42 U.S.C. § 12112(b)(6). Our decision in *Bates I* reveals why Dura presses this point: only "qualified individual[s]" with disabilities can bring a (b)(6) claim, and none of the plaintiffs-appellees meet this requirement. *See Bates I*, 625 F.3d at 285–86. Their (b)(6) claims necessarily would fail.

Dura contends that the qualifications-standard framework applies because its drug testing applied to all employees, and ADA regulations define "qualification standard" as "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). True enough, but nothing in subsections (b)(6) or (d)(4) renders these provisions mutually exclusive. As noted above, subsection (d)(4) prohibits employers from requiring medical examinations and disability inquiries "of an employee," regardless of whether (s)he has a disability, and no one denies that plaintiffs-appellees were employees. Accordingly, the district court properly allowed the (d)(4) claim to proceed.

*B.  The Regulated Conduct of 42 U.S.C. § 12112(d)(4)(A): Medical Examinations &*
*Disability Inquiries*

Whether Dura's drug-testing constituted a "medical examination" or "disability inquiry" under (d)(4) presents a close question because the ADA leaves these terms undefined.  Though many ADA provisions "protect[] 'qualified individuals with a disability' from discrimination based on their disability," *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1093 (6th Cir. 1998) (quoting 42 U.S.C. § 12112(a)), subsection (d)(4) protects all employees from medical inquiries, regardless of whether they have a qualifying disability.  *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 813 n.6 (6th Cir. 2012).[3]  Specifically, this provision states:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[4]

42 U.S.C. § 12112(d)(4)(A) (1991).  This broad protection reflects Congress's effort to "curtail all questioning that would serve to identify and exclude persons with disabilities from consideration for employment."  *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir. 1998); *see also Harrison v. Benchmark Elecs. Huntsville*, 593 F.3d 1206, 1213–14 (11th Cir. 2010) (citing H.R. Rep. No. 101-485, pt. 2, at 1).

Dura argues that its drug-testing protocol sought no information about employees' physical or mental health, or even employees' general use of medications, but only whether the employees ingested illegal drugs or prescription medications with machine-operation warnings.  Looking to the statutory language, one can easily imagine a medical examination consisting of a urine test to determine whether a patient has a

---

[3]To give a sense of the breadth of subsection (d)(4)'s protection, we note that the ADA already defines "disability" to include "being regarded as having . . . an impairment" that "substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A) & (C).  The (d)(4) protection applies to all employees, regardless of whether the employer suspects a health condition.

[4]Because these events took place before the effective date of the ADA's 2008 amendments, we refer to the pre-2008 version of the statute.

health condition, but Dura's testing, implemented by a third-party firm to avoid unnecessary disclosure to Dura, defies easy classification. A different ADA provision exempts testing for "illegal use of drugs" from the prohibition on medical examinations, but that provision offers little guidance here, because Dura's screening for prescribed medications exceeded its parameters. *See* 42 U.S.C. § 12114(d)(1) ("[A] test to determine the illegal use of drugs shall not be considered a medical examination.").

Presented with this ambiguity, the parties direct our attention to the EEOC's enforcement guidance, which defines "medical examination" and "disability-related inquiry" and offers illustrative examples, none of which addresses this specific type of drug testing. We defer to these informal administrative interpretations "to the extent of [their] persuasive power," *E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 500 (6th Cir. 2006) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)), acknowledging that our previous cases recognize their "very persuasive authority," *Kroll*, 691 F.3d at 815 (citation omitted).

*1. Medical Examination*

The relevant EEOC guidance defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and identifies several factors bearing on this determination:

> (1) whether the test is administered by a health care professional;
> (2) whether the test is interpreted by a health care professional;
> (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* Part B.2 (July 27, 2000) (hereinafter "DRI&ME Guidance"), *available at* http://www.eeoc.gov/policy/docs/guidance-inquiries.html. "In many cases, a

combination of factors will be relevant in determining whether a test or procedure is a medical examination," but in others "one factor may be enough." *Id.*; *see also Kroll*, 691 F.3d at 815–16. Examples of medical examinations include vision tests, blood pressure and cholesterol screening, range-of-motion tests, and diagnostic procedures such as x-rays, CAT scans, and MRIs. The guidance also identifies two qualifying urine tests: (1) to discover alcohol use, and (2) to detect disease or genetic markers.

The district court bypassed the above medical-examination considerations, focusing instead on the guidance's prohibition of testing for alcohol use and the ADA's limited drug-testing exemption. If the ADA prohibits urinalysis testing for the use of a legal substance (alcohol), the court reasoned, it must ban testing for other legal substances, like prescription medications. (*See* R. 237, Trial Tr. at 621–23.) While this logic has facial appeal—especially given alcohol's association with vice and medicine with virtue—it fails here.

First, the guidance itself gives contrary instructions on alcohol testing. *See* DRI&ME Guidance Part B.2 n.31 (cross-referencing n. 26, which states that employers "may maintain and enforce rules prohibiting employees from being under the influence of alcohol in the workplace and may conduct alcohol testing for this purpose" upon reasonable suspicion); *see also id.* Part B.1 (authorizing employers to ask employees whether they have been drinking); *but see* EEOC, *Enforcement Guidance: Preemployment Disability-Related Questions & Medical Examinations* (Oct. 10, 1995) (hereinafter "Preemployment Guidance"), *available at* http://www.eeoc.gov/policy/docs/preemp.html (explaining that an employer cannot give alcohol tests to job applicants because such tests "are medical, and there is no statutory exemption").[5] The ADA's allowance that employers "*may* require that employees shall not be under the influence of alcohol . . . at the workplace," 42 U.S.C. § 12114(c)(2)

---

[5] The Preemployment Guidance also sheds light on our inquiry because the ADA's ban on medical examinations and disability inquiries also applies to the preemployment stage. 42 U.S.C. § 12112(d)(2)(A); *Kroll*, 691 F.3d at 816 n.9.

(emphasis added), further cautions against extending the guidance's alcohol-testing example to these circumstances.

Second, the ADA's drug-testing exemption, while not applicable to plaintiffs-appellees' prescribed medications, reaches further than the district court acknowledged. By permitting testing as to the "*illegal use* of drugs," 42 U.S.C. § 12114(d)(1) (emphasis added)—as opposed to the *use of illegal drugs*—the exemption contemplates circumstances where employees abuse medications not prescribed to them. *See* 29 C.F.R. § 1630.3(a)(2) ("Illegal use of drugs means the use of drugs the possession or distribution of which is unlawful under the Controlled Substances Act," but "does not include the use of a drug taken under the supervision of a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law"). So, while the illegality of use bears on whether the employer may invoke the drug-testing exception, the legality of a substance does not settle the medical-examination question. For that, we turn to the EEOC's definition and the medical-examination factors.

The first, second, sixth, and seventh factors—what one might call the optics—tip the scales toward medical examination because FFS administered urine-based tests in a quasi-medical setting, with medical equipment, and health professionals interpreted the results. The fifth factor (task performance/physiological response) appears inapplicable. The fourth factor (invasiveness), meanwhile, offers little guidance. Though a urine sample certainly intrudes on a private bodily function, neither plaintiffs-appellees nor the EEOC argues that Dura's tests were invasive, and we have recognized in other legal contexts that urine tests typically "are not invasive of the body." *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 699 (6th Cir. 2011) (Fourth Amendment search, quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989)). That said, the EEOC's Preemployment Guidance suggests that the "drawing of blood, urine or breath" may demonstrate invasiveness.

That brings us to the third factor, "arguably the most critical in this analysis": whether the test is designed to reveal an impairment or the employee's health. *Kroll*,

691 F.3d at 819.  The Preemployment Guidance doubles down on this point, adding an eighth factor: whether "the employer [is] trying to determine the applicant's physical or mental health or impairments."  This emphasis on a diagnostic purpose aligns with the EEOC definition of medical-examination and links that term to its sister term, disability inquiries.  *See* DRI&ME Guidance (looking to whether the "procedure or test . . . seeks information about an individual's physical or mental impairments or health"); 42 U.S.C. § 12112(d)(4)(A) (prohibiting medical examinations and inquiries "as to whether such employee is an individual with a disability or as to the nature or severity of the disability").  The "uncovering of [health] defects at an employer's direction is the precise harm that § 12112(d)(4)(A) is designed to prevent."  *Kroll*, 691 F.3d at 819.

The test-design inquiry entails both subjective and objective considerations.  Though not dispositive, "the employer's purpose must be considered in the larger factual context of a particular test or assessment's typical uses and purposes."  *Id.* at 816.  "[W]hen an employer's purported intentions mismatch the predominant purpose and design of a particular test or assessment, . . . those intentions are accorded less weight and significance in the analysis."  *Id.* at 817.  As with other anti-discrimination protections, this standard reflects that wrongdoers seldom admit their misdeeds.

Here, Dura denies using its drug-testing protocol to reveal impairments or health conditions, and a fair reading of the record supports this.  Far from a "free peek into a[n] . . . employee's medical history," *see Connolly v. First Pers. Bank*, 623 F. Supp. 2d 928, 931 (N.D. Ill. 2008), the evidence shows that Dura abstained from asking plaintiffs about their medical conditions, and only one plaintiff suggested that Dura directly asked her to identify the medications she was taking, albeit with conflicting testimony.  (*See* R. 236, Bates Test. at 389–91.)  Importantly, the plaintiffs-appellees offer no evidence showing *how* FFS's urinalysis or post-test reporting of machine-restricted medications revealed information to Dura about plaintiffs-appellees' medical conditions.  The urine test itself revealed only the presence of chemicals—amphetamines, barbiturates, benzodiazepines, cocaine, ecstasy, marijuana, methadone, methamphetamine, opiates, oxycodone, phencyclidine, and propoxyphene.  No one suggests that the consumption

of prescription medications containing these chemicals constitutes protected medical information (or even an "impairment") under the EEOC definition of medical examination.

FFS's post-test reporting, meanwhile, disclosed to Dura only the machine-restricted medications. When asked at oral argument how Dura's third-party-administered test exposes information about employee health, the EEOC responded "it can," noting that the presence of anti-seizure medication would divulge that specific condition. (O.A. at 34:40–35:00.) In the absence of specific evidence making this connection, we decline to elevate this possibility into the probability necessary for ruling on this issue as a matter of law. Although some prescription medications may reveal more than meets the eye because of brand-name recognition and ubiquitous marketing campaigns, an employer might struggle to discern medical conditions from the prescription drugs discovered here, which included a number of prescription pain relievers. Arguably, this attenuated testing protocol—with a narrow focus on substances containing machine-operation restrictions, as opposed to all prescription drugs—reflects Dura's effort to avoid obtaining information about employees' medical conditions and to avoid discriminating against all employees who take prescription drugs.

Of course, an employer cannot hire a third party to discriminate on its behalf. *See* 42 U.S.C. § 12112(b)(2) (prohibiting employers from "participating in a contractual . . . relationship that has the effect of subjecting a[n] . . . employee with a disability to the discrimination prohibited by this subchapter"); *see also* DRI&ME Guidance Part B.1 n.20 (explaining that the "prohibition against making disability-related inquiries applies to . . . indirect or surreptitious inquiries"). But, viewing the evidence in its favor, we cannot say as a matter of law that Dura used FFS's drug tests to seek information about plaintiffs-appellees' medical conditions, or even that such revelations likely would result.

Still, much depends on Dura's credibility. Inconsistencies between Dura's written and actual drug-testing policies and its disparate treatment of individual employees may evince a pernicious motive. For instance, one plaintiff (Bates) claims that Dura asked her directly about her prescription medications and fired her for not

reporting them, and Dura allowed another plaintiff (Long) to return to work despite testing positive. If credited, a jury could reject Dura's explanation as a pretext for screening out potentially disabled employees. Moreover, plaintiffs-appellees may present evidence that the disclosure of machine-restricted medications typically reveals confidential health information, such that the jury could determine that the test targets information about an employee's physical or mental health, regardless of Dura's intent.

This fact-sensitive inquiry presents a genuine issue of fact inappropriate for judgment as a matter of law. *See Kroll*, 691 F.3d at 819–20 (vacating the district court's grant of summary judgment to the employer, finding a genuine issue of fact regarding whether prescribing psychological counseling to an employee constituted an impermissible medical examination under § 12112(d)(4)(A)). The EEOC acknowledged as much during oral argument, conceding that there "may be a fact question" regarding whether Dura's drug tests were designed to reveal information about their employees' health. (O.A. at 33:40–34:00.) Plaintiffs-appellees argue that the majority of guidance factors compel a legal conclusion here, but, in the absence of statutory or regulatory language specifically prohibiting this type of testing, simple arithmetic does not carry the day. In our view, the test-design factor and the EEOC definition of medical examination would permit a reasonable jury to decide the matter in Dura's favor. If one credits Dura's explanation and the objective evidence shows its drug-testing protocol is unlikely to reveal employees' medical information, then the testing does not qualify as a medical examination under the EEOC definition.

### 2. *Disability Inquiries*

So too with § 12112(d)(4)(A)'s prohibition on "inquiries . . . as to whether [an] employee is an individual with a disability or as to the nature or severity of the disability"—what the EEOC has termed "disability-related inquiries." Plaintiffs-appellees devote little attention to this issue in their appellate briefing, but the EEOC directs us to an example appearing in the EEOC guidance: disability-related inquiries "may include . . . asking an employee whether s/he currently is taking any prescription drugs or medications, [or did] in the past, or monitoring an employee's taking of such

drugs or medications." DRI&ME Guidance Part B.1. Language in our recent decision *Lee v. City of Columbus, Ohio*—a case applying analogous provisions of the Rehabilitation Act—echoes this principle. 636 F.3d 245, 254 (6th Cir. 2011) ("Obviously, asking an employee whether he is taking prescription drugs or medication, or questions seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,] trigger the ADA's (and hence the Rehabilitation Act's) protections." (internal citation and quotation marks omitted)). Yet, as with the medical-examination inquiry, the issue ultimately turns on contested issues of fact.

For starters, the guidance's definition of "disability-related inquiry" cuts against a broad application of the above example. The guidance defines disability-related inquiry as "a question (or series of questions) that is likely to elicit information about a disability." DRI&ME Guidance Part B.1. Conversely, the guidance explains that "[q]uestions that are not likely to elicit information about a disability are not disability-related inquiries and, therefore, are not prohibited under the ADA." *Id.* Examples of permissible inquiries include asking about an employee's general well-being, a non-disability impairment such as a broken limb, and alcohol or illegal-drug use. EEOC Guidance Part B.1.

Dura denies asking employees about their general prescription-drug usage. Viewing the evidence in its favor, Dura's third-party-administered test revealing only machine-restricted medications differs from directly asking employees about prescription-drug usage or monitoring the same, per the guidance example.[6]

Next, the EEOC guidance lists prescription inquiries as conduct that "may" constitute a disability-related inquiry; it does not state a categorical rule. *Id.*; *see also id.*

---

[6]The footnote illustrating this guidance example cites cases involving more intrusive employer policies that monitored employees' use of prescription medications. *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1226 (10th Cir. 1997) (policy required employees to report all medications and permitted only supervisor-approved prescription medications); *Krocka v. Bransfield*, 969 F. Supp. 1073, 1079–80 (N.D. Ill. 1997) (policy utilizing blood tests monitored police officers' use of psychotropic medication).

Question 8 (explaining that an employer "[g]enerally" may not "ask *all employees what prescription medications* they are taking" because such questioning "is not job-related and consistent with business necessity").  Underscoring this point, the Preemployment Guidance gives this nuanced instruction:

> May an employer ask applicants about their lawful drug use?

> No, *if the question is likely to elicit information about disability*. Employers should know that many questions about current or prior lawful drug use are likely to elicit information about a disability, and are therefore impermissible at the pre-offer stage.  For example, questions like, "What medications are  you currently taking?" or "Have you ever taken AZT?" certainly elicit information about whether an applicant has a disability.

Preemployment Guidance (emphasis added).

The district court emphasized this likely-effects analysis in its two previous rulings denying judgment on this claim, stating that:

> "[B]ecause Dura's general focus was on the feared consequences that the drugs would have on its employees—not on the underlying malady—the [disability] inquiries prong does not appear to be a good 'fit' for the facts of this case."  Based on the court's review of the record and the unique facts of this case, it remains questionable whether the evidence at trial will show that Dura's questioning was designed to or did elicit information about disabilities.  However, as discussed herein, the evidence adduced at trial will determine the ultimate applicability of these terms to each plaintiff.

(R. 116, Summ. J. Order at 11 n.5 (quoting R. 97, Recons. Op. at 11 n.4).)

What changed?  The court's *sua sponte* Rule 50 judgment for plaintiffs fails to explain the about-face (*see* R. 237, Trial Tr. at 622–23), and it does not appear that the evidence developed at trial obviated this genuine factual dispute.  We agree with the district court's earlier analysis: a jury could reasonably conclude that Dura implemented a drug-testing policy in a manner designed to avoid gathering information about employees' disabilities.

The *Lee* dictum does not counsel otherwise. First of all, *Lee* did not apply these enforcement guidances to a drug test. It *rejected* the employees' Rehabilitation Act claim, finding that the employer could require employees returning from sick leave to provide a doctor's note describing the "nature of the illness." 636 F.3d at 257–59. Further, the principal case it cites for the proposition that an employer may not request an employee's prescription medications, *Doe*, held that such a demand presented an *issue of fact* regarding whether the employer discriminated against a job applicant who used psychotropic medications. *Doe*, 531 F.3d at 358–59.[7]

A drug test that requires positive-testing employees to disclose medications to a third party, who then relays only machine-restricted medications to the employer, need not reveal information about a disability. As noted above, plaintiffs-appellees point to no evidence showing that such a limited disclosure likely reveals information about a disability. They conclusorily state that "[c]learly, this protocol was designed to seek information on possible weaknesses in employees who were per se excluded from the workplace in violation of § 12112(d)(4)(A)," but a reasonable jury could disagree. *Cf. Harrison*, 593 F.3d at 1210, 1216 (finding a question of fact regarding whether the employer's presence during a temporary employee's drug test and questioning by an MRO "exceeded the scope of the [disability-related inquiry] likely-to-elicit standard," where the employer overheard discussion of the applicant's epilepsy and his use of prescription barbituates).

### 3. Conclusion

Dura's drug-testing protocol pushes the boundaries of the EEOC's medical-examination and disability-inquiry definitions. It certainly goes further than what the ADA's drug-testing exemption specifically permits, *see* 42 U.S.C. § 12114(d), but does

---

[7] The other decision *Lee* cited for this principle, *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084 (S.D. Cal. 2010), involved a questionnaire that asked detailed questions about employees' medical histories, disability benefits, and medication usage. That court found that the questionnaire constituted an impermissible disability inquiry under the ADA. *Id.* Unlike the *Scott* questionnaire, Dura's drug test neither sought nor obtained information about plainitffs' medical histories, disability benefits, or general medication usage.

not clearly fit the EEOC's definitions and examples of prohibited conduct. The breadth of this ADA protection, which applies to all employees, cautions against our expansion of what constitutes prohibited conduct by legal interpretation. At the same time, an overly narrow interpretation of these protections could render § 12114(d)'s limited drug-testing exception the rule, undermining Congress's remedial intent. *See* H.R. Rep. 101-485, pt. 2, at 79 (explaining that the drug-testing exemption "should not conflict with the right of individuals who take drugs under medical supervision *not to disclose their medical condition* before a conditional offer of employment has been given" (emphasis added)).

Accepting the EEOC's fact-bound definitions of "medical examination" and "disability-related inquiry" as reasonable, we conclude that a reasonable jury could decide these issues either way. We therefore vacate the district court's judgment and remand for a trial on the regulated-conduct issue: whether Dura's drug testing constituted a medical examination or disability inquiry. On remand, the court shall instruct the jury in accordance with the statutory language and the EEOC guidance. The EEOC definitions of these terms shall be paramount, with the medical-examination factors and guidance examples illustrative of their meaning.

III.

Our remand of the (d)(4) claim requires us to address Dura's remaining legal objections pertaining to jury instructions, weight of the evidence regarding business necessity, the availability of damages, and punitive damages.

*A.  Agency Jury Instruction*

Dura takes issue with the following jury instruction regarding agency:

[A]s a matter of law, . . . Freedom from Self—and its employees were the agents of Dura. Therefore, with regard to the drug testing of the Plaintiffs, you are to consider any act of Freedom from Self and its employees to be an act of Dura.

The ADA definition of "employer" includes "any agent of such person," 42 U.S.C. § 12111(5)(A), a relationship typically determined by common-law agency principles, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 n.7 (6th Cir. 1997). But the challenged jury instruction here addresses a broader agency concept: whether FFS's conduct necessarily constitutes Dura's conduct for purposes of determining the design and likely effects of Dura's drug tests. The answer to this question matters because FFS received more information about employees' prescription medications than Dura did.

On that score, the ADA offers more specific guidance. It prohibits employers from "participating in a contractual or other arrangement or relationship that has the *effect* of subjecting a . . . qualified applicant or employee with a disability to the discrimination prohibited by [the ADA]." 42 U.S.C. § 12112(b)(2) (emphasis added). Similarly, the EEOC interprets subsection (d)(4)'s protections to cover not just direct inquiries by the employer, but also "indirect or surreptitious inquiries such as a search through an employee's belongings to confirm an employer's suspicions about an employee's medical condition." DRI&ME Guidance n.20. In short, employers may not use third parties to circumvent ADA protections. *See also Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000) ("Employers do not escape their legal obligations under the ADA by contracting out certain hiring and personnel functions to third parties.").

Yet these precepts do not compel the conclusion that Dura used FFS to retrieve protected information. Rather, as explored above, Dura may have used FFS to insulate itself from proscribed information. The factfinder may consider FFS's role in Dura's drug-testing protocol to the extent that it bears on Dura's intent and/or whether the testing would likely reveal plaintiffs-appellees' physical and mental-health conditions to Dura. But the jury ought not be instructed to assume that, because FFS obtained additional information during the testing protocol, Dura also sought to obtain that information. The district court's instructions should so reflect and direct the factfinder

to the remaining liability issue: whether Dura's testing constituted a medical examination or disability inquiry under subsection (d)(4).

*B. The Justification Under 42 U.S.C. § 12112(d)(4)(A): The Jury's Adverse Verdict*

Next, Dura challenges the sufficiency of the evidence supporting the jury's adverse verdict on the second part of their (d)(4) claim, the justification issue. The jury found Dura's drug tests neither job related nor a matter of business necessity. Our remand of the regulated-conduct issue does not disturb this finding. We therefore consider Dura's challenge to the weight of the evidence.

Appeals courts uphold jury verdicts unless contrary to the "clear weight of the evidence." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820–21 (6th Cir. 2000). Our review reduces to a test of objective reasonableness asking whether "a reasonable juror could reach the challenged verdict"; we will not "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions." *Id.* at 821 (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). Because the evidence supports the jury's verdict, the district court acted within its discretion in denying a new trial on this issue. *See id.*

The employer shoulders the burden of proving the job relatedness and business necessity justifying a medical examination or disability-related inquiry. *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The EEOC instructs that

> a disability-related inquiry or medical examination of an employee may be job-related and consistent with business necessity when an employer has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition.

DRI&ME Guidance (quotation marks and footnotes omitted). This "reasonable belief . . . must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be

based on general assumptions." *Id.*; *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) ("[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job."). The guidance further explains that an employer "[g]enerally" may not "ask *all employees what prescription medications they are taking*," because such an inquiry "is not job-related and consistent with business necessity," but notes that the questioning may be necessary for "employees in positions affecting public safety." DRI&ME Guidance.

Dura presented some evidence at trial supporting its drug testing—e.g., testimony and video evidence of the "congested" nature of the Lawrenceburg facility and numerous hazards there, including machinery, glass, chemicals, and forklifts. Nonetheless, plaintiffs-appellees also presented evidence consistent with a reasonable jury conclusion that Dura's showing fell short of the high standard for job relatedness and business necessity. For example, Jent testified that Dura neglected to make individualized risk determinations of jobs, tools, and work stations in the facility. Jent and Boots also admitted that they failed to consider the plaintiffs' abilities or the risk that they posed by taking medications. The jury could infer from this evidence that Dura lacked a reasonable belief, based on objective evidence, that plaintiffs-appellees' medications impaired their abilities to do their jobs or made them dangerous to others. Further, Killen testified that employees had unrestricted access to hazardous parts of the facility and were not required to wear hard hats. Indeed, the video of the facility showed individuals with loose clothing, jewelry, and long hairstyles, in apparent violation of Dura's safety policies. This evidence reasonably supports the conclusion that Dura could have advanced its interest in employee safety by other, less intrusive means.

Because the evidence supported the jury's conclusion, we affirm the district court's denial of a new trial on the (d)(4) justification issue.

## C.  Availability of Statutory Damages

Dura next contests the availability of damages under the ADA's damages provision, 42 U.S.C. § 12117(a), arguing that the non-disabled plaintiffs-appellees do not qualify under the statute as "person[s] alleging discrimination on the basis of disability." We reject this argument because § 12112(d)(1) clarifies that the ADA "prohibition against discrimination referred to in [§ 12112(a)] . . . include[s] medical examinations and inquiries," and subsection (d)(4) extends this protection to all employees.  42 U.S.C. § 12112(d)(1), (d)(4).  The ADA ban of "discriminat[ion] . . . on the basis of disability" thus encompasses medical examinations and disability inquiries involving employees. Because the damages provision does not exclude (d)(4) claims, we affirm the district court's judgment that plaintiffs-appellees qualify for statutory damages should they prevail on their (d)(4) claim.

## D.  Jury's Punitive Damages Award

Finally, Dura challenges the sufficiency of the evidence supporting the jury's award of punitive damages.  The ADA permits an award of punitive damages "if the complaining party demonstrates that the [employer] engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(a)(2) & (b)(1).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).  To be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536.  "Employers who are simply 'unaware of the relevant federal prohibition' or believe that the discrimination is lawful are not subject to punitive damages liability." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002) (quoting *Kolstad*, 527 U.S. at 536–37).

Here, though certain facts supported the jury's award of punitive damages, the jury had no meaningful opportunity to consider Dura's defense that it "tried to craft and

carry out its policy in compliance with the law" (Appellant Br. at 49) because the district court determined the (d)(4) regulated-conduct issue as a matter of law. By starting with the premise that Dura conducted prohibited testing, the jury's punitive damages analysis likely addressed only Dura's justification for the tests (deemed insufficient), without considering the very real possibility that Dura intended its drug tests to comply with the ADA. Since the jury must determine whether Dura's tests constituted medical examinations or disability inquiries, and that decisionmaking process might affect the jury's perspective on punitive damages, we think it appropriate to permit the jury to examine the two at the same time. We therefore reverse the district court's denial of a new trial on the issue of punitive damages, consistent with our reversal of the district court's judgment on the (d)(4) regulated-conduct issue.

## IV.

For the above reasons, we AFFIRM in part, REVERSE in part, VACATE the district court's judgment, and REMAND with instructions. We reverse the district court's conclusion that Dura's drug-testing protocol constituted either a medical examination or disability inquiry under 42 U.S.C. § 12112(d)(4) as a matter of law. We also vacate the related punitive-damages award. We remand for a trial on only these two issues.

On remand, the jury shall first decide whether Dura's drug testing constituted a medical examination or disability inquiry, relying on the definitions and illustrative examples provided by the relevant EEOC guidance. If the jury finds Dura liable, it shall proceed to consider the appropriateness of punitive damages under the applicable ADA standard.

To the extent that the district court denied relief on Dura's two remaining issues—the availability of statutory damages and the jury's adverse business-necessity/job-relatedness verdict—we affirm the district court's judgment. Nevertheless, because we remand for a trial on a threshold liability issue, the availability of statutory

damages, like the availability of punitive damages, depends upon the jury finding that Dura's drug testing constituted a medical examination or disability inquiry.

———————————

**DISSENT**

———————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  Here are the undisputed facts: In 2007, Dura implemented a new substance-abuse policy.  Within the broad sweep of that policy came legal drugs, including lawfully prescribed medications and over-the-counter drugs.  Dura reserved the right to enforce its policy via employee drug testing, and hired Freedom From Self (FFS), a third-party drug-testing company, to administer drug tests to its employees.

Dura employed a two-phased drug-testing protocol.  First, FFS performed "instant panel" tests on urine samples collected from Dura employees.  Based on the instant-panel test results, Mark Jent and Lindy Boots of Dura sent positive-testing employees home.  Positive samples were sent for confirmatory testing and employees were afforded the opportunity to provide a medical review officer (MRO) with a medical explanation for the positive test results.  If the MRO concluded that the employee had a valid medical justification, the MRO would change the final test result to negative, send the final result to FFS, and FFS would forward the final result to Dura.

Dura elected to disregard this policy.  Instead of crediting the MRO's revisions, Dura instructed positive-testing employees to bring their medications to FFS for documentation.  FFS then reported each employee's machine-restricted medications to Dura.

Were this the end of the story, I might agree with the majority that a fact question precluded judgment as a matter of law as to whether Dura's drug tests were medical examinations or inquiries proscribed by 42 U.S.C. § 12112(d)(4)(A).  But this is not the end of the story.  It is also undisputed that FFS implemented a "blanket policy" of terminating employees who tested positive for medications carrying a machine-restriction warning.  Some of the terminated employees provided Dura with doctor's notes stating that the use of their prescription medication did not affect work performance.  Dura,

however, refused to allow these employees to return to work unless they discontinued their medications regardless of whether the medications had any real likelihood of affecting their ability to perform the job safely. That Dura categorically disregarded medical advice in such a manner is compelling evidence that its drug-testing program was designed to discover and then to discriminate against employees with health conditions.

My disagreement with the majority on this score is thus twofold. The majority takes a cramped view of the third EEOC guidance factor—whether a test is designed to reveal an impairment of physical or mental health. And in service of this cramped view, the majority fails to consider how the drug tests fit within the broader context of Dura's policies. First, the majority reads "designed" too narrowly, focusing on Dura's implementation of the drug-testing protocol to the exclusion of other relevant evidence. According to the majority, because FFS reported only employees' machine-restricted medications to Dura, a reasonable jury could conclude that Dura designed its protocols to avoid obtaining information about employees' underlying medical conditions. But as we emphasized in *Kroll v. White Lake Ambulance Authority*, an employer's purpose in using a particular test must be considered in its "larger factual context." 691 F.3d 809, 816 (6th Cir. 2012). In this case, that larger factual context includes how Dura used the test results.

This brings me to my second point of disagreement. Irrespective of whether the tests were initially designed to seek out information regarding employees' health conditions, when the tests are considered alongside Dura's blanket-firing policy, a reasonable jury could conclude only that they were designed to detect an employee's health condition in order to carry out the unlawful purpose of the blanket firings. Indeed, if, as Dura claims, the protocol was designed only to disclose machine-restricted medications for safety purposes, then Dura had absolutely no reason to disregard any of plaintiffs' doctors who ensured Dura that the employees could perform their jobs safely notwithstanding their use of machine-restricted medications. This leads to the inescapable conclusion that Dura's drug tests, far from being designed to ferret out

employees who could not safely operate machinery, were actually designed to reveal impairments in physical or mental health.

At bottom, the majority concludes that § 12112(d)(4)(A) only prohibits the use of tests that reveal an employee's specific impairment. Because Dura's drug-testing protocols did not disclose which precise impairments its employees had, only that they had impairments, the majority reasons that its conduct was lawful. But nothing in the statute, the EEOC's guidance, or our case law counsels so narrow an interpretation. Congress prohibited medical examinations unless job related and justified by a business necessity. *See EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) ("[T]he statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose.'" (quoting 29 C.F.R. § 1630.13(b))). There is no business justification for an employer to inquire into whether its employees are impaired if the employer is going to disregard the nature and limitations of that impairment. I would hold that § 12112(d)(4)(A) proscribes inquiries designed to determine whether an employee is impaired, just as it proscribes inquiries designed to determine an employee's specific impairment.

One final point is in order. I do not read *Kroll* as elevating one factor in importance over the others or as pronouncing a general rule favoring jury conclusions on the issue of whether a test is designed to reveal an impairment of physical or mental health. Even accepting the majority's assessment of the third factor, the district court did not err in granting judgment as a matter of law. Here four factors weigh in favor of the district court's decision, two factors are inconclusive, and only one factor, the third, is disputed. To hold that this dispute precludes judgment as a matter of law is to hold that the third factor alone is dispositive. It is not.

Accordingly, I would affirm the district court's grant of judgment as a matter of law.