NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0435n.06

Case Nos. 16-4259/17-4135

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 20, 2019
DEBORAH S. HUNT, Clerk

NICHOLAS SIEWERTSEN,                                )

    Plaintiff-Appellant/Cross-Appellee,        )

                                                                    )

v.                                                                         )   ON APPEAL FROM THE UNITED

                                                                    )   STATES DISTRICT COURT FOR

                                                                    )   THE NORTHERN DISTRICT OF

WORTHINGTON INDUSTRIES, INC.,            )   OHIO AT TOLEDO

    Defendant-Appellant/Cross-Appellee        )

BEFORE: BATCHELDER, DONALD, and THAPAR, Circuit Judges

**BERNICE BOUIE DONALD, Circuit Judge.** Nicholas Siewertsen has worked for Worthington Industries, Inc. ("Worthington"), a steel manufacturing company, since 1999. For part of his tenure, Siewertsen worked as a shipper, which entailed operating forklifts, overhead cranes, and other motorized equipment. Siewertsen is also deaf.

In 2011, Worthington implemented a company-wide policy that disallowed deaf employees from operating forklifts. Siewertsen filed suit, alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA") and Ohio law.

In 2015, both parties filed motions for summary judgment. A key dispute at that stage centered on an admission that Siewertsen made during discovery. He admitted that "operators of the [overhead crane] must be able to hear audible sounds in order to avoid injury to others." At summary judgment, though, he moved to withdraw that admission, arguing that there had been an

error in translation. The district court granted Siewertsen's motion to withdraw and subsequently denied both parties' motions for summary judgment.

The case proceeded to a bifurcated trial, with the first portion concerning liability and the second concerning damages. After the close of evidence at the trial on liability, each party moved for judgment as a matter of law. The district court denied both motions, and the jury returned a verdict in favor of Siewertsen.

Prior to the trial on damages, the district court excluded Siewertsen's damages experts and denied his motion for a punitive damages jury instruction. At the close of the evidence, the district court granted Worthington's motion for a directed verdict on backpay, finding that Siewertsen had not proven that he was entitled to such damages. After the trial, Worthington filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure ("FRCP"), and a motion for judgment as a matter of law pursuant to FRCP 50(b). The district court denied both motions. Prior to a verdict being rendered in the damages trial, though, the district court ordered the parties to enter into settlement negotiations, and the parties reached a resolution pending the outcome of this appeal.

The rulings submitted for review are whether the district court: (1) properly granted Siewertsen's motion for leave to withdraw his response to request for admission no. 10, (2) appropriately denied both parties' motions for judgment as a matter of law, (3) correctly granted Worthington's motion for a directed verdict on back pay damages, (4) abused its discretion in declining to give a punitive damages jury instruction, (5) abused its discretion when it excluded Siewertsen's damages experts, and (6) properly denied Siewertsen's post-trial motion for declaratory judgment. For the reasons stated below, we **AFFIRM**.

## I. BACKGROUND[1]

Siewertsen has worked at Worthington's Delta Plant since 1999. The Delta Plant is a steel-processing center where workers manipulate raw steel to customers' specifications and then ship it to them. From 2001 through 2008, Siewertsen was officially assigned to work in packaging, but he testified at trial that he frequently performed all jobs in the shipping department, including operating forklifts and overheard cranes multiple times per week. Worthington employees informally trained Siewertsen to operate a forklift in 2000, and Worthington formally certified Siewertsen to drive a forklift in 2004. Worthington recertified Siewertsen several times after that, with the latest coming in 2010.

In early 2011, Worthington sought an expert opinion from David Hoover, the owner and President of Forklift Training Systems, concerning the ability of a deaf person to operate a forklift in Worthington's plants.[2] Hoover replied that he did not believe a deaf person could safely operate a forklift in that environment. Worthington accepted Hoover's opinion and enacted a policy disallowing deaf employees, including Siewertsen, from operating forklifts.

Worthington subsequently determined that, due to Siewertsen's limited communication skills, he was eligible for only four positions at the Delta Plant, all of which Siewertsen described as entry-level and that provided no room for advancement. Siewertsen was transferred to one of those positions but did not have his pay decreased.

Siewertsen filed suit on November 28, 2011, alleging that Worthington illegally discriminated against him on the basis of his disability in violation of Ohio law and the ADA. On September 25, 2015, the district court denied summary judgment to both parties.

---

[1]The following consists of testimony from the trial on liability. It is necessarily presented in the light most favorable to Siewertsen because a substantial portion of the analysis below concerns whether the district court was correct in denying Worthington's motions for judgment as a matter of law and for a new trial.

[2]This inquiry was unrelated to Siewertsen.

A three-day jury trial on liability commenced on September 6, 2016. At the trial, Siewertsen testified that he transferred from the packaging department to the shipping department in 2008, which he characterized as a promotion. In the shipping department, Siewertsen's duties consisted of driving forklifts and operating overhead cranes to load steel coils onto trucks for delivery. He said that the department was very busy, but he loved working there.

The shipping department itself is made up of fields of large metal coils waiting to be shipped, and a shipping bay where trucks and trains arrive to be loaded. In some areas of the coil fields, the coils were stacked on top of each other such that they created blind spots. The composition of the fields, and thus the blind spots, were ever-changing because shipping-department employees loaded trucks throughout the day.

The shipping-department employees navigated the coil fields and the loading bays on foot, in forklifts, and on bikes.[3] Siewertsen admitted that the coil fields were dangerous. To avoid accidents between machines and pedestrians, the employees operating forklifts and overhead cranes would honk their horns and flash their lights when approaching blind spots in the coil fields and when driving through the loading bay.[4] Siewertsen stated that he was able to communicate with the truck drivers through hand gestures and written messages.

Siewertsen also testified that he took extra precautions to ensure he maintained a safe work environment. Prior to operating his forklift every day, he checked to make sure the horn was functioning properly by sounding it and feeling for the vibration. If Siewertsen believed the horn was not working, he would alert a supervisor and stop operating that forklift. *Id.* Siewertsen said that he always sounded the horn as he approached a blind spot and that he would stop to look

---

[3]The employees walked while operating the overhead cranes.

[4]The testimony from trial established that the shipping department, though busy, was not loud and that everyone could hear the horns of the forklifts and cranes.

before continuing. He would also observe pedestrians' reactions as he approached them to make sure they heard the horn. Siewertsen averred that he honked the horn on his overhead cranes so much that "it might [have] bothered some of the other employees[.]" He also testified that he never walked through the loading area quickly or without following the proper safety procedures.

Siewertsen further testified that he never had an accident while driving the forklift and that he had always received high marks in his employee evaluations. Siewertsen did admit, however, that he had been involved in a near-miss accident in 2010 while walking through the coil field. He explained that his view to the right was obstructed by coils, and a forklift operator nearly hit him as he drove past the intersection into which Siewertsen was walking.

In addition, another Worthington employee testified that Siewertsen was involved in a near-miss accident while driving a forklift. In that one, Siewertsen, purportedly, almost hit a pedestrian. The incident was not formally reported, and Siewertsen denied it occurred.

At the close of the evidence both parties moved for judgment as a matter of law, but the district court denied each party's motion. The jury returned a verdict in favor of Siewertsen on the only issues presented to it: (1) whether he was capable of performing the essential functions of the shipper position; (2) whether he suffered an adverse employment action; and (3) whether Worthington failed to prove its direct-threat defense.

The district court set a trial on damages for September 27 through 28, 2016. Prior to the trial, the court excluded Siewertsen's damages experts and denied Siewertsen's motion for a punitive-damages instruction. At the close of the trial, the district court granted Worthington's motion for a directed verdict on back pay, holding that Siewertsen was not entitled to such damages. Siewertsen appeals all three rulings.

After the trial on damages but before the jury reached a verdict, the district court ordered the parties to enter into settlement negotiations regarding the amount of compensatory damages owed to Siewertsen. The parties agreed to a stipulation that, should this matter have proceeded to a verdict as to damages, Siewertsen would have been awarded $150,000.00 in compensatory damages. The stipulation also contained a caveat that, in the event we reverse the district court, the stipulation is void.

Worthington then filed a motion for a new trial under FRCP 59 and a renewed motion for judgment as a matter of law under FRCP 50(b). Siewertsen did not renew his motion for a new trial. The district court denied both motions, which Worthington now appeals.

## IV. ANALYSIS

The following analysis proceeds chronologically, addressing first the pre-trial issue raised by Worthington, then turning to the issues arising from the trial on liability, and concluding with the issues connected to the trial on damages.

### A. Request for Admission No. 10

In its request for admission number 10, Worthington asked Siewertsen to "[a]dmit that operators of the [overhead crane] must be able to hear audible sounds in order to avoid injury to others." Siewertsen initially admitted this was true. At summary judgment, though, Siewertsen argued that he should be allowed to withdraw the admission pursuant to FRCP 36(b) because he misunderstood the requested admission, and because it would not prejudice Worthington. The court granted his motion. Worthington appeals, arguing that we should reverse the district court's decision because Worthington suffered prejudice as a result of the withdrawn admission. We affirm.

"We review the district court's decision . . . to allow a party to withdraw or amend Rule 36 admissions for abuse of discretion." *See S.E.C. v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 Fed. App'x 183, 191 (6th Cir. 2008) (citing *Conlon v. United States,* 474 F.3d 616, 621 (9th Cir.2007)); *see also Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 154 (6th Cir. 1997). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012). "This Court may not disturb the district court's determination unless it has a 'definite and firm conviction that the trial court committed a clear error of judgment.'" *Paterek v. Village of Armada*, 801 F.3d 630, 643 (6th Cir. 2015) (quoting *FTC v. EMA Nationwide, Inc.,* 767 F.3d 611, 623 (6th Cir. 2014)).

Pursuant to FRCP 36(b), a district court should only allow a withdrawal or an amendment of an admission if two conditions are met: (1) "the presentation of the merits of the action will be subserved thereby," and (2) "the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 154 (6th Cir. 1997) (citation and internal quotation marks omitted).

Worthington pins its entire argument on the second prong—asserting that it was prejudiced in its defense against Siewertsen's claims. It contends that the district court clearly erred because (1) the court conceded that Worthington would be prejudiced by the withdrawal, and (2) the prejudice Worthington suffered is obvious because Siewertsen did not attempt to withdraw the admission for nearly three years.

Initially, we note that Worthington misconstrues the district court's order. The court did not find that Worthington would be prejudiced by the withdrawal. Specifically, the court stated, "To remedy any prejudice Worthington *may* incur from this decision, it may take such reasonable additional discovery as is necessary to that end." Thus, the court did not find that Worthington was prejudiced, and it even took an extra step to ensure that it would not be.

Next, the court's finding that Worthington did not necessarily suffer prejudice fits within our precedent. As we have previously opined, "[t]he prejudice contemplated by [Rule 36(b)] is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth." *Kerry Steel, Inc.*, 106 F.3d at 154 (quoting *Brook Village North Assoc. v. General Elec. Co.,* 686 F.2d 66, 70 (1st Cir. 1982). Prejudice under Rule 36(b), rather, "relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission." *Id.* (citation and internal quotation marks omitted).

Worthington's entire argument is premised on the length of time Siewertsen allowed the admission to remain uncontroverted. However, Worthington does not submit any evidence of special difficulties it faced in obtaining evidence to remedy the withdrawal or establish how it was prejudiced at trial. To allow it to avoid any prejudice, the district court even reopened discovery as to this issue. Moreover, during the trial—which occurred a year later—Worthington cross-examined Siewertsen concerning the withdrawn admission. Thus, the district court did not abuse its discretion in allowing Siewertsen to withdraw the admission because Worthington has not established that it was prejudiced.

**B.      Worthington's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial[5]**

After the trial on damages, Worthington renewed its motion for judgment as a matter of law under FRCP 50(b).  The district court denied it, and Worthington now appeals.

"We review de novo the district court's denial of [a] Defendant['s] renewed motion for a judgment as a matter of law."  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citing *Radvansky v. City of Olmsted Falls,* 496 F.3d 609, 614 (6th Cir. 2007)).  In doing so, "[w]e . . . may grant the motion 'only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'"  *Id.* (quoting *Radvansky*, 496 F.3d at 614).  We do not reweigh the evidence or assess witness credibility, and "our review is restricted to the evidence . . . admitted at trial."  *Id.* (citing 9B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2540 (3d ed. 2008)).

In the district court, Worthington argued that no reasonable juror could find that (1) Siewertsen could perform the essential functions of a shipper, (2) that Siewertsen suffered an adverse employment action, or (3) that Worthington failed to prove its direct threat defense.  It reasserts those same arguments here.

**1.      The Essential Functions of a Shipper**

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  It "does not include the marginal functions of the position."  *Id.*  Courts consider the following non-exhaustive list of factors in determining whether a function is essential:

---

[5]Ohio courts follow federal law in regard to disability discrimination claims filed under O.R.C. § 4112.02.  *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013).  Therefore, there is no need for a separate discussion of the elements of a claim for disability discrimination under Ohio law.

(i)   The employer's judgment as to which functions are essential;

(ii)  Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv)  The consequences of not requiring the incumbent to perform the function;

 . . .

(vi)  The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

§ 1630.2(n)(3).  "The inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Cty. Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Hall v. United States Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir.1988) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.")).

It is undisputed that shippers must communicate.  Siewertsen admitted as much while testifying.  The dispositive question is whether "communication" in this context encompasses the ability to hear audible communications.  The district court found that there were genuine issues of material fact and submitted the question to the jury.  The jury determined that it did not.  Because the question was appropriately submitted to, and resolved by, the jury, we affirm.

At trial, Worthington attempted to establish that the ability to hear is an essential function of a shipper by submitting proof that shippers are required to operate forklifts and overhead cranes, enter the coil field, and move among motorized equipment while on foot.  It also showed that the noise level in the shipping department is low enough to allow for audible communication.  Worthington produced documentation that, in its judgment, the ability to hear and talk are required physical attributes of a shipper.  It also admitted into evidence policies that require forklift operators to sound the horn when they are coming around a blind spot, approaching a pedestrian, and crossing an aisle.

For his part, Siewertsen put on evidence that he could perform the essential functions of a shipper without the ability to hear. Siewertsen's expert testified that Siewertsen could safely operate the forklift through sight, and that he could sufficiently communicate through hand signals. Siewertsen himself testified that he had operated forklifts and other machinery for over ten years without an accident and that he had been certified to operate a forklift multiple times since 2000. One of Worthington's own witnesses corroborated Siewertsen's testimony that he had not had any accidents. Siewertsen further testified that he communicated with truck drivers through written notes and gestures.

Thus, both parties submitted evidence concerning the type of communication required to perform the essential functions of a shipper. The jury was not required to give controlling weight to any one factor, including Worthington's judgment or policies. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 765-66 (6th Cir. 2015) (en banc) ("None of this is to say that whatever the employer says is essential necessarily becomes essential . . . . Our ruling does not, in other words, require blind deference to the employer's stated judgment."). The jury weighed the evidence and concluded that Siewertsen could perform the essential functions of a shipper, even though he could not hear. Overturning the jury's decision when there is evidence to support it is beyond the scope of FRCP 50. Therefore, we affirm.

### 2. Adverse Employment Action

Worthington argues that the evidence at trial is insufficient to sustain the jury's verdict that Siewertsen suffered an adverse employment action when he was prohibited from working as a shipper and transferred to a different position.

An adverse employment action is "'a materially adverse change in the terms or conditions of employment because of [the] employer's conduct.'" *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (quoting *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883 (7th Cir.

1989)). "Under this standard, a 'materially adverse' change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (quoting *Kocsis*, 97 F.3d at 885). "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claim[s]," *Kocsis*, 97 F.3d at 885, but "[a] reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation[,]'" *White v. Burlington Northern & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting *Kocsis*, 97 F.3d at 886).

Worthington asserts that Siewertsen did not suffer an adverse employment action because he was not terminated and because he did not have his pay decreased.

Viewing the evidence in the light most favorable to Siewertsen, there is sufficient evidence for a reasonable juror to find that Siewertsen suffered an adverse employment action. To begin, Siewertsen testified that he loved his job as a shipper and that he found it challenging. In contrast, upon being transferred, Worthington limited him to just three positions—all of which Siewertsen regarded as entry level. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 392 (6th Cir. 2010) (holding that a reasonable jury could find an adverse employment action where an employee was transferred to a position that, among other things, required less training and was less challenging). Additionally, Siewertsen testified that the transfer prevented him from attaining promotions, and he was limited in the amount of raises he could obtain. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 470-71 (6th Cir. 2012) (holding that a transfer can result in an adverse employment action where the transferred employee's career prospects are significantly limited); *see also O'Neal*

*v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). Based on our prior precedent, a reasonable juror could have found that Siewertsen suffered an adverse employment action.

### 3. Worthington's Direct Threat Defense

In Worthington's final assignment of error as to the district court's denial of its motion for judgment as a matter of law, Worthington contends that the record shows that Siewertsen posed a direct threat. If Worthington can establish that he was, Siewertsen is not qualified to be a shipper, and Worthington is absolved of liability. *See Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 401-03 (6th Cir. 2000). Worthington, however, did not establish that Siewertsen was a direct threat.

"The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). To determine whether an individual poses a direct threat, an employer must undertake "an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). The "assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* "[T]he factors to be considered include: (1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." *Id.* In carrying out this analysis, courts should remain mindful of the underlying objective of the ADA: "'[t]hat people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have.'" *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)). Employers are thus prohibited "'from making adverse employment decisions based on stereotypes and generalizations

associated with the individual's disability rather than on the individual's actual characteristics.'" *Id.* (quoting *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998)).

Here, a reasonable juror could have found that Worthington did not establish that Siewertsen posed a direct threat to the safety of others.

Siewertsen testified that he had driven a forklift for Worthington for over ten years without having an accident. He described his daily safety protocols and how he communicated with others, and his testimony was buttressed by his expert witness, who testified that Siewertsen could operate a forklift safely. While Worthington did elicit testimony to the contrary, including opinions from experts and co-workers that Siewertsen was unsafe, we do not weigh evidence or gauge credibility. The question before us is whether the record contains sufficient evidence from which a reasonable juror could have found that Siewertsen did not pose a direct threat. It does. Accordingly, we affirm.

## C.     Siewertsen's Motion for Judgment as a Matter of Law

Siewertsen appeals the district court's denial of his motion under FRCP 50(a) for judgment as a matter of law as to all issues related to liability. Worthington argues that Siewertsen waived his right to appeal this claim because he did not file a post-trial motion under FRCP 50(b).

Now that we have affirmed the denial of Worthington's motion for judgment as a matter of law, this issue appears to be moot. To the extent it is not, we affirm the denial of Siewertsen's motion for the same reason we affirmed above—both sides presented competent evidence to submit the issue of liability to the jury.

**D.    The District Court's Denial of Siewertsen's Motion for a Punitive Damages Instruction**

"The ADA permits an award of punitive damages 'if the complaining party demonstrates that the [employer] engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] federally protected rights.'" *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 583 (6th Cir. 2014) (quoting 42 U.S.C. § 1981a(a)(2), (b)(1)). "To be liable for punitive damages, 'an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law.'" *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).

During the trial on liability, Siewertsen never requested a jury instruction on punitive damages or a finding that Worthington acted maliciously or with reckless indifference. Siewertsen did request a punitive damages instruction prior to the trial on damages, however. The district court denied the motion, noting that the trial was bifurcated so that the evidence could be presented efficiently, and the trial on liability was the appropriate forum in which to litigate all issues related to Worthington's conduct. The court found that it would undermine the purpose of the bifurcation to allow Siewertsen to put on further evidence of Worthington's conduct during the trial on damages. Siewertsen appeals.[6]

Siewertsen frames this issue as simply a question of whether the district court abused its discretion in denying his motion for a punitive damages instruction. In reality, though, these facts present a two-step inquiry: (1) whether the district court abused its discretion in determining the manner in which it tried the issues in the case, and if so, (2) whether the court abused its discretion in denying Siewertsen's motion for the punitive damages instruction during the trial on damages.

---

[6]Worthington argues that Siewertsen waived this issue because the district court actually granted Worthington's motion for judgment as a matter of law, and Siewertsen did not appeal the court's order granting that motion. Worthington, however, overlooks docket entry number 178, in which the district court specifically states that Siewertsen preserved the punitive damages issue for appeal. While this is an unusual way to preserve an issue for appellate review, we will address Siewertsen's argument.

Siewertsen only perfunctorily addresses the first question, and it is dispositive as to the second. We find that the district court did not abuse its discretion in efficiently trying this case and therefore affirm its denial of Siewertsen's motion.

Under FRCP 42(b), a district court has broad discretion over whether to try issues separately and the manner in which it does so. *See Yung v. Raymark Indus., Inc.*, 789 F.2d 397, 400 (6th Cir. 1986). "[M]any courts have upheld cases bifurcated between liability and damages because the evidence pertinent to the two issues is wholly unrelated, and as a logical matter, liability must be resolved before the question of damages." *In re Bendectin Litigation*, 857 F.2d 290, 309 (6th Cir. 1988). Siewertsen all but avoids FRCP 42 and whether the court appropriately bifurcated the trial. He argues only that he did not request a punitive damages instruction during the liability phase because the district court bifurcated the trial over his objection and that he would not need to re-litigate Worthington's conduct because the same jury heard both trials. Such brief argument constitutes forfeiture of the district court's decision to bifurcate the trial. *United States v. Johnson,* 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]."). Therefore, we find the district court acted within its discretion in requiring all issues related to Worthington's conduct be litigated during the trial on liability.

To demonstrate that he was eligible to receive punitive damages, Siewertsen had to establish that Worthington acted with malice or reckless indifference. *Bates*, 767 F.3d at 583. It is axiomatic that these findings relate solely to Worthington's conduct. Because Siewertsen did not seek a jury finding that Worthington's conduct rose to maliciousness or reckless indifference during the liability phase of the trial, and the district court appropriately prohibited further

litigation of Worthington's conduct during the damages phase, Siewertsen was not entitled to a punitive damages instruction.

### E.      The Exclusion of Siewertsen's Damages Experts

Prior to the damages phase of the trial, the district court granted Worthington's motion to exclude Siewertsen's damages experts, finding that their report was neither reliable nor relevant. Specifically, the court held that the report made invalid assumptions concerning Siewertsen's lost opportunity for advancement and promotion and did not establish that the report was based on a reliable methodology. Siewertsen appeals, arguing that the court erred on both counts. Because the report is not reliable, we affirm.

We review a district court's decision to exclude the testimony of an expert for an abuse of discretion. *Pride v. BIC Corp.*, 218 F.3d 566, 575 (6th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999)). Admission of expert testimony is governed by Federal Rule of Evidence 702. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In short, the report must "rest[] on a reliable foundation and [be] relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). When determining reliability, a district court should consider "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93. While there is no "definitive checklist or test," the Supreme Court has set forth a number of factors that generally "bear on the

inquiry." *Id.* at 593. These factors include "whether the theory or technique in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and finally, whether the theory or technique enjoys general acceptance in the relevant scientific community." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (quoting *Daubert*, 509 U.S. at 594). The inquiry is flexible and its "focus . . . must be solely on principles and methodology, not on the conclusions that the [report] generate[s]." *Daubert*, 509 U.S. at 595.

Siewertsen's position is that the district court cited the correct legal standard but applied it incorrectly. He also argues that the district court made clearly erroneous findings. We disagree.

Siewertsen's experts prepared a report wherein they calculated damages based on Siewertsen's lost opportunity for advancement and promotion after he was removed from the shipper position. The district court found that the report was unreliable because Siewertsen's experts did not explain certain methodologies or disclose others. The district court was within its discretion in making those determinations.

To begin, Siewertsen's experts calculated his earning power based on his average yearly income from 2011 to 2015. However, Siewertsen's experts never explained why they used that formula, and they failed to explain why that formula was reliable or recognized as reliable. Additionally, the experts appended a "Worklife Probability" chart to the report in which they calculated that Siewertsen would sustain a future loss of $359,738.00 if he were not transferred back to the shipper position. But the only explanation offered as to the methodology underlying the chart is that it represents the difference in Siewertsen's wages pre- and post-removal from the shipper position. Again, though, there is no explanation for why the calculation is reliable or even

useful in this case. Therefore, we find that the district court did not abuse its discretion in excluding Siewertsen's experts.

## F.       Directed Verdict on Back Pay

After the close of Siewertsen's evidence in the trial on damages, the district court granted Worthington's motion for a directed verdict as to back pay, finding that Siewertsen's evidence was too speculative to support an award. We affirm.

Back pay in this context is an equitable remedy, and therefore, an award is within the trial court's discretion. *See* 42 U.S.C. §§ 12117(a), 2000e-5; *Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015); *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 820 (6th Cir. 2016); *Harris v. Richards Mfg. Co.*, 675 F.2d 811, 815 n.2 (6th Cir. 1982). Once a finding of discrimination has been found, back pay "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). Even with this edict, however, "[t]o prevail on a claim for back pay . . . a plaintiff must establish the amount of back pay with reasonable certainty." *Szeinbach*, 820 F.3d at 824 (6th Cir. 2016) (citing *McMahon v. Libbey-Owens-Ford Co.*, 870 F.2d 1073, 1079 (6th Cir. 1989)). While a plaintiff need not prove damages "'with the exactitude of lost profits in a breach of contract case, neither can such an award be appropriately founded on mere speculation.'" *Hance v. Norfolk S. Ry.*, 571 F.3d 511, 520 (6th Cir. 2009) (quoting *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991)).

In the district court, Siewertsen requested back pay for lost wages, lost overtime, lost profit sharing, and lost deferred profit sharing. All of Siewertsen's proof at trial consisted of his previous payment records and his own testimony concerning calculations done by him and his attorneys.

Because Siewertsen's calculations were mere speculation with no grounding in fact, he did not carry his burden of establishing he was entitled to back-pay damages.

Siewertsen first asked for a total of $28,542.00 in lost wages. He testified that he calculated this total by taking the average hourly wage of similar shipping department employees from 2011 through 2016 and subtracting what he believed his hourly wage would have been during that time. He determined that the difference was around ten percent and thus multiplied his total earnings by ten percent for those years.

However, Siewertsen's numbers were incorrect, inconsistent, and based on pure speculation. First, he based his entire damages calculation on an initial, unreasonable raise—a methodology for which he had no explanation. Second, he admits that he did not receive a decrease in pay upon being transferred out of the shipping department and that he continued to receive raises. His theory of damages therefore is that he would have received higher raises if he would have been allowed to remain in the shipping department, but Siewertsen admitted that raises at Worthington were dependent on employees' evaluations and other budgetary factors and thus were not predictable. He also testified that he had no evidence of the rate of yearly raises for his shipping-department comparators, and he did not know their evaluation scores, how long they had worked in the shipping department, or what jobs they had previously held. Accordingly, Siewertsen submitted no proof from which a reasonable juror could discern whether Siewertsen's actual raises were less than what he would have received had he remained in the shipping department. The district court's decision to grant Worthington's motion for a directed verdict did not frustrate the purpose of the ADA because there was no competent proof to support such an award.[7] *Szeinbach*, 820 F.3d at 824 ("The plaintiff cannot rest her entitlement to back pay on

---

[7]Because Siewertsen's claims as to profit sharing are derivative of his claim for back pay, he is also not entitled to damages stemming from any alleged lost profit sharing.

'mere speculation' about what she would have earned in the absence of discrimination.") (citation omitted).

Siewertsen made similar errors in regard to his claim for lost overtime. He argued that he was entitled to $46,999.00 in lost overtime compensation. He based that number solely on the difference in the amount of annual overtime pay he earned in 2010 versus 2011 through 2016. However, Siewertsen admitted that his overtime compensation in 2010 was an outlier because the plant was short-staffed. He also conceded that he was unaware of the total amount of available overtime hours in the shipping department versus the packaging department from 2011 through 2016 and that the shipping department actually had less overtime available to be worked than did the packaging department. Moreover, Siewertsen testified that he was unaware of any other shipping-department employee who earned as much in overtime from 2011 through 2016 as Siewertsen had in 2010. Therefore, Siewertsen's loss-of-overtime evidence was based on pure speculation.

**G.      Siewertsen's Post-Trial Motion for Declaratory Judgment**

On September 27, 2016, the district court granted in part and denied in part Siewertsen's motion for declaratory judgment and injunctive relief. In its order, the court granted Siewertsen's motion insofar as the court mandated that Worthington "return [Siewertsen] to the shipper position by September 30, 2016; remove the restriction that [he] may not operate a forklift or similar "powered industrial equipment"; and remove restrictions, if any, limiting [his] application for positions in the manufacturing department. The court also stated that, "[s]hould [Siewertsen] believe that [Worthington] has violated this Order, [Siewertsen] may file an appropriate Motion or Complaint."

Siewertsen, however, also sought a declaratory judgment that Worthington's blanket policy preventing deaf people from operating certain motorized equipment violates the ADA and Ohio

law.  The district court denied this portion of his motion, opining that such relief is overbroad, unnecessary, and unsupported by the jury's verdict.  Siewertsen appeals that denial.

We review a district court's decision to grant or deny a motion for declaratory relief for an abuse of discretion.  *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 526 (6th Cir. 2001).  In doing so, we consider the following factors:

> 1) whether the judgment would settle the controversy; 2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; 3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" 4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy that is better or more effective.

*Id.* (quoting *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967-68 (6th Cir. 2000)).  We address the factors seriatim.

As to the first factor, the controversy has been settled.  Siewertsen alleged that Worthington violated the ADA and Ohio law by refusing to allow him to work as a shipper.  A jury found in his favor, and he has been returned to that position.  We have now affirmed that verdict on appeal. Therefore, a broader judgment would not assist in settling the controversy.

As for the second factor, declaring that the blanket policy violates the ADA and Ohio law would not further clarify the legal relations between the parties.  The district court has already ordered that Siewertsen be returned to his shipper position and that Worthington remove any restrictions limiting him from applying for other positions within the manufacturing department. Moreover, Worthington has conceded that the district court's order encompasses Worthington as a company, not just its Delta Plant.  Lastly, the court instructed Siewertsen to file a motion with it if he believed Worthington violates its order.  The relationship between the parties is sufficiently clear without need for a further ruling.

Finally, as to the fifth factor,[8] Siewertsen has not submitted argument demonstrating that a broader declaration would be more effective.  As above, the controversy has been settled, and the legal relations between the parties have been sufficiently established.  The district court did not abuse its discretion in declining to issue a declaratory judgment that Worthington's blanket policy violated the ADA and Ohio law.

## V.  CONCLUSION

For the foregoing reasons, the district court is **AFFIRMED**.

---

[8]Neither party has argued that the third or fourth factors are at issue.